UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

DONNA DAWN KONITZER
a/k/a Scott Konitzer,

Plaintiff,

v.                                                    Case No. 03-C-717

MATTHEW J. FRANK, TOM MICHLOWSKI,
MARIO CANZIANI, SHARON ZUNKER,
TOM SPEECH, DAVID BURNETT,
and BYRAN BARTOW,

Defendants.

DECISION ON GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 155)

Plaintiff[1], an inmate at the Wisconsin Resource Center (WRC), is proceeding

on a Third Amended Complaint, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and

42 U.S.C. § 1983, claiming the defendants are violating rights secured to the plaintiff by

the Eighth Amendment of the United States Constitution. The Third Amended Complaint

charges that the defendants are subjecting the plaintiff to cruel and unusual punishment

by failing to administer proper treatment for the plaintiff's Gender Identity Disorder ("GID")

and is seeking an order:

---

[1]Konitzer is a male-to-female transsexual who has been prescribed feminizing hormones for
several years and feels like a woman trapped in a man's body. While the court recognizes that this action
was filed by Konitzer under the apparent chosen name of Donna Dawn, Konitzer remains a biological
male. Therefore, for clarity, this decision will utilize male pronouns where appropriate, although the court is
sensitive to Konitzer's preference.

(1)     enjoining the defendants, their employees, agents and successors in office from providing medical care and treatment to the plaintiff that is inconsistent with the standards of medical care and treatment for GID in the State of Wisconsin as a whole;

(2)     enjoining the defendants, their employees, agents and successors in office from refusing to provide and delaying provision of necessary medical treatment and care for GID to the plaintiff either at suitable and adequate facilities within the WRC or elsewhere;

(3)     enjoining the defendants, their employees, agents and successors in office from failing to instruct, supervise and train their employees and agents in such a manner as to assure the delivery of medical treatment and care to the plaintiff which is consistent with the standards of medical care in the State of Wisconsin as a whole;

(4)     establishing an independent panel of medical experts to regularly evaluate the delivery of medical treatment and care to the plaintiff and ensuring compliance with court orders respecting this matter; and

(5)     awarding the costs and expenses of this action.

The defendants disagree and are asking for partial summary judgment dismissing all but one of the plaintiff's claims for injunctive relief.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

2

*McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute of "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial—(1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law—is upon the moving party. However, when the opponent is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 (stating that "proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, courts draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F .2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## II. RELEVANT UNDISPUTED FACTS[2]

---

[2] Facts are taken from the July 15, 2005 Defendants' Proposed Findings of Fact and February 28, 2006 Amendment to Defendants' Proposed Findings of Fact, both of which are cited as "DFOF". Facts are also taken from the October 3, 2005 Plaintiff's Proposed Findings of Fact, the April 28, 2006 Amended and Additional Proposed Findings of Fact, and the November 28, 2006 Plaintiff's Proposed Findings of Fact in Support of Surreply in Opposition to Defendants' Motion for Summary Judgment, all of which are

3

A. Background

Konitzer was first committed to the Wisconsin Department of Corrections (DOC) in April 1982. (DFOF ¶ 1.) Between April 1982 and May 1993, Konitzer was housed in several DOC correctional institutions, having been released on three separate occasions. (DFOF ¶ 2.) He escaped from custody in May 1991, and was unaccountable until being captured on May 28, 1991. *Id.* Konitzer's most recent period of incarceration began December 20, 1994, following a conviction on three counts of armed robbery masked; three counts of armed robbery; one count of armed robbery—repeater; and one count of possession of a firearm by a felon. (DFOF ¶ 3.) He is serving a 128-year sentence and is eligible for parole on June 10, 2026. (DFOF ¶ 4.) Konitzer's maximum release date is February 9, 2081, whereas his maximum discharge date is June 11, 2122. *Id.*

At an early age, Konitzer did not feel comfortable as a biological male. (PFOF ¶ 34.) Often, he would dress in his sister's clothes and wear his mother's makeup. *Id.* Most of the time, Konitzer kept his discomfort about his body to himself. (PFOF ¶ 35.) When he told his parents that he felt like a girl, his stepfather tried to convince him otherwise and beat him when that failed. *Id.*

While serving a previous sentence, Konitzer told prison psychiatrists that he believed he was a transsexual. *Id.* A February 13, 1988, clinical dictation by Pauline Thome states:

> Mr. Konitzer was found guilty of making a weapon. He appealed but the appeal was denied. During the appeal, he

cited as "PFOF".

4

said he was making a weapon to disguise the fact that he was making stockings for himself with the shirts. By admitting what he was doing, Mr. Konitzer broke a 10 year secret about his transsexualism. Mr. Konitzer does not experience a conflict about his sexual identity, only a conflict about bringing it out in the open. He feels extremely threatened by the possibility that other inmates will know about his transsexual behavior, and his homosexual inclination.

(PFOF ¶ 37, Cothroll Decl. ¶ 4, Ex. 208, Bates No. 2668-69.)

In 1993, Konitzer began seeking treatment for GID at Pathways Counseling Center in Milwaukee. (PFOF ¶ 38.) Pathways evaluated Konitzer and determined that he suffered from GID, placed him in group therapy, and referred him for hormone therapy. *Id.* During that time, Konitzer began referring to himself as Donna, initiated electrolysis, dressed as a woman, and sought relationships with friends who supported his belief that he was a woman. *Id.*

About three months into the hormone therapy, Konitzer was introduced to cocaine by a friend, Kelly Stark. (PFOF ¶ 40.) Stark pressured Konitzer to quit hormone therapy in hopes of an intimate relationship with her. *Id.* Addicted to cocaine, Konitzer ceased taking his female hormones and stopped attending therapy sessions at Pathways, thereby causing his female development to end. (PFOF ¶ 41.) While on cocaine, Konitzer committed several crimes which led to his arrest in June 1994 and the sentence he is now serving. (PFOF ¶ 42.)

Konitzer has been housed at various DOC correctional institutions, including Dodge Correctional Institution (DCI), Waupun Correctional Institution (WCI), Green Bay Correctional Institution (GBCI), the Wisconsin Resource Center (WRC), and Columbia Correctional Institution (CCI). (DFOF ¶ 7.) While incarcerated at GBCI, Konitzer used a

5

razor blade to cut open his scrotal tissue, leaving one testicle exposed and losing a lot of blood. (DFOF ¶ 47.) On September 5, 2002, he was moved to the WRC due to disfigurement attempts involving use of a nail clipper to wound his scrotum. (DFOF ¶ 10.)

The WRC is part of the Department of Health and Family Services (DHFS), Division of Disability and Elder Services and provides mental health treatment to the DOC inmates as its primary mission. (DFOF ¶ 12-13.) The DOC and the DHFS employees work at the WRC. (DFOF ¶ 14.) The DOC employees include security staff, namely, the captains, the sergeants, and the correctional officers.

Defendant Byran Bartow has been employed by the DHFS as Director of the WRC since approximately March 28, 2000. (DFOF ¶ 15.) As Director, Bartow manages the WRC. (DFOF ¶ 16.) He is involved in policy making and signs all the WRC policies and procedures, including those related to treatment. Defendant Mario Canziani has been employed by the DHFS as the WRC Security Director since August 1996. (DFOF ¶ 17.)

There are approximately 344 DOC inmates housed in the WRC for mental health care programs, and 60 patients detained or committed as sexually violent persons under Wis. Stat. Chapter 980. (DFOF ¶ 18.) Only male inmates and patients are housed at the WRC. (DFOF ¶ 19.) Typically, inmates are transferred to the WRC when they exhibit mental health problems in the prison environment, such as withdrawn or unresponsive demeanor and adjustment difficulties, including suicide attempts. (DFOF ¶ 20.) The DOC is required to provide the WRC with referral information, but there are no strict diagnostic criteria required of the DOC inmates transferred to the WRC. (DFOF ¶ 21.) The WRC conducts intake and does an assessment of new inmates, which includes

medication review and psychiatric evaluations. (DFOF ¶ 22.) Inmates are then placed in a program or series of programs which staff believe best meet their needs.

The DOC does not establish policies at the WRC, but the WRC adheres to the DOC's policies and administrative rules, except when the issue is central to the mental health care of the inmates housed at the WRC. (DFOF ¶ 23.) Eventually, most inmates at the WRC are transitioned back to the DOC. (DFOF ¶ 24.) The WRC administrators believe it is in the best interests of inmates that they are treated no differently at the WRC than they would be at the DOC because consistent treatment makes it easier for the inmate to transition back into the DOC. Also, they believe that if inmates were treated differently, other inmates may be encouraged to seek transfers to the WRC by acting out in a manner that would facilitate their transfer to the WRC and delay their return to the DOC. Thus, the WRC attempts to maintain as much of a prison environment as possible for safety, as well as for treatment and inmate management. (DFOF ¶ 26.)

B.  Gender Identity Disorder

The DOC diagnosed Konitzer with GID in December 1999 and the DOC has prescribed hormone therapy since that date. (PFOF ¶ 2; DFOF ¶ 28; DFOF ¶¶ 210-303.) Konitzer feels "trapped in the wrong body." (PFOF ¶ 3.) The disconnect between Konitzer's male body and his female identity causes him a great deal of stress, and he has been diagnosed with post traumatic stress disorder. (PFOF ¶ 4.) To relieve this stress, Konitzer has tried to live as a female while in prison. *Id.*

GID is a rare disorder with an approximate incidence between 1 in 11,900 to 45,000 in males and 1 in 30,000 to 100,000 in females. (PFOF ¶ 6.) Persons with GID are uncomfortable being regarded by others, or functioning in society, as a member of their

7

designated sex. (PFOF ¶ 5.) Some persons with GID seek hormonal and surgical treatments to alleviate their discordance. *Id.*

The Diagnostic and Statistical Manual, Fourth Edition ("DSM-IV"), is a manual that lists various mental health conditions and is used to standardize diagnoses and to provide a reference point respecting diagnoses, including GID. (PFOF ¶¶ 14-15.) The DSM-IV defines GID as: (1) A strong and persistent cross-identification (not merely a desire for any perceived cultural advantage of being the other sex) manifested by symptoms such as a stated desire to be the other sex, frequent passing as the other sex, desire to live or be treated as the other sex, or the conviction that he or she has the typical feelings and reactions of the other sex; (2) Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex; (3) The disturbance is not concurrent with a physical intersex condition; and (4) The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning. (PFOF ¶ 16.)

The DSM-IV sub-classifies a GID patient by the patient's sexual preference as attracted to males, attracted to females, attracted to both, or attracted to neither. (PFOF ¶ 17.) The sub-classification was intended to assist in determining, over time, whether individuals of one sexual orientation or another experienced better outcomes using particular therapeutic approaches; it was not intended to guide treatment decisions. (PFOF ¶ 18.) *Id.*

8

The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, Sixth Version, February 2001 ("Standards of Care")[3], provide in relevant part:

> The Purpose of the Standards of Care. The major purpose of the Standards of Care (SOC) is to articulate this international organization's professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorder. Professionals may use this document to understand the parameters within which they may offer assistance to those with these conditions. Persons with gender identity disorders, their families, and social institutions may use the SOC to understand the current thinking of professionals. All readers should be aware of the limitations of knowledge in this area and of the hope that some of the clinical uncertainties will be resolved in the future through scientific investigation.
>
> **The Overarching Treatment Goal.** The general goal of psychotherapeutic, endocrine, or surgical therapy for persons with gender identity disorders is lasting personal comfort with the gendered self in order to maximize overall psychological well-being and self-fulfillment.
>
> **The Standards of Care Are Clinical Guidelines.** The SOC are intended to provide flexible directions for the treatment of persons with gender identity disorders. When eligibility requirements are stated they are meant to be minimum requirements. Individual professionals and organized programs may modify them. Clinical departures from these guidelines may come about because of a patient's unique anatomic,

---

[3] The parties dispute the relevance of the Standards of Care to the professional treatment of individuals with GID. According to the defendants, the Standards of Care provide guidelines that have been helpful in professionalizing the treatment of GID. (DFOF ¶ 30.) The defendants further assert that the Standards of Care have no regulatory authority and there is not universal consensus in the psychiatric community about what constitutes "the" treatment for GID or what constitutes medical necessity in the treatment of GID. (DFOF ¶¶ 31-32.)

The plaintiff disputes that the Standards of Care are merely helpful guidelines. According to Konitzer, the Standards of Care were designed to present professional consensus about psychiatric, medical, and surgical management of gender conditions—referred to as the "Triadic Treatment"—and the parameters within which professionals could offer services to individuals. (PFOF ¶ 20.) Typically, the Triadic Therapy takes place in the order of: 1) hormones, 2) real-life experience, and 3) surgery. (PFOF ¶ 24.) A GID patient, however, may undergo a variety of different therapeutic options because clinicians recognize that not all persons with GID need or want all three elements of Triadic Therapy. (PFOF ¶ 25.)

Case 2:03-cv-00717-CNC   Filed 05/10/10   Page 9 of 68   Document 238

social, or psychological situation, an experienced professional's evolving method of handling a common situation, or a research protocol. These departures should be recognized as such, explained to the patient, and documented both for legal protection and so that the short and long term results can be retrieved to help the field to evolve.

**The Clinical Threshold.** A clinical threshold is passed when concerns, uncertainties, and questions about gender identity persist during a person's development, become so intense as to seem to be the most important aspect of a person's life, or prevent the establishment of a relatively unconflicted gender identity. The person's struggles are then variously informally referred to as a gender identity problem, gender dysphoria, a gender problem, a gender concern, gender distress, gender conflict, or transsexualism. Such struggles are known to occur from the preschool years to old age and have many alternate forms. These reflect various degrees of personal dissatisfaction with sexual identity, sex and gender demarcating body characteristics, gender roles, gender identity, and the perceptions of others. When dissatisfied individuals meet specified criteria in one of two official nomenclatures - the International Classification of Diseases 10 (ICD-10) or the Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition (DSM-IV) they are formally designated as suffering from a gender identity disorder (GID). Some persons with GID exceed another threshold - they persistently possess a wish for surgical transformation of their bodies.

**Two Primary Populations with GID Exist - Biological Males and Biological Females.** The sex of a patient always is a significant factor in the management of GID. Clinicians need to separately consider the biologic, social, psychological, and economic dilemmas of each sex. All patients, however, should follow the SOC.

. . . .

After the diagnosis of GID is made the therapeutic approach usually includes three elements or phases (sometimes labeled triadic therapy): a real-life experience in the desired role, hormones of the desired gender, and surgery to change the genitalia and other sex characteristics.

10

. . . .

Many persons with GID will desire all three elements of triadic
therapy. Typically, triadic therapy takes place in the order of
hormones => real-life experience => surgery, or sometimes:
real-life experience => hormones => surgery.

. . . .

However, the diagnosis of GID invites the consideration of a
variety of therapeutic options, only one of which is the
complete therapeutic triad. Clinicians have increasingly
become aware that not all persons with gender identity
disorders need or want all three elements of triadic therapy.

(George Daley Dep., Sept. 10, 2004, Ex. 12, Bates No. 5478-80.)

When Konitzer's current period of incarceration began, he did not have any

female development. (PFOF ¶ 43.) Following his convictions, Konitzer's gender dysphoria

did not subside, and his distress worsened because he was living as a male. (PFOF ¶ 45.)

Konitzer tried to obtain hormone therapy while incarcerated at WCI, but his request was

denied by a nurse. *Id.* In November 1999, Konitzer wrote defendant Sharon Zunker, then

Director of the Bureau of Health Services, requesting hormone therapy and an

orchiectomy. (PFOF ¶ 46.) The request proved unsuccessful. *Id.* However, on

December 8, 1999, Dr. Metodio Reyes requested authorization to continue Konitzer's

hormone therapy. (DFOF ¶ 214.) The next day, DOC Medical Director George Daley

approved the request. (DFOF ¶ 215).

While at GBCI, Konitzer also requested the opportunity to live as female, and

sought the help of Dr. Gerald Wellens in obtaining makeup and female undergarments.

(PFOF ¶ 60.) Dr. Wellens was unable to assist Konitzer in obtaining makeup or female

undergarments and was told by GBCI Warden Daniel Bertrand, "if you let one inmate wear

11

a bra and panties, then they'll all want to wear a bra and panties." (PFOF ¶ 62.)
Afterward, Konitzer would make cosmetics and find ways to obtain female undergarments.
(PFOF ¶ 63.)

On April 27, 2000, Konitzer received an adult conduct report at GBCI for
wearing a bra. (PFOF ¶ 66.)  While at GBCI, Dr. Wellens observed that Konitzer wore
makeup regularly. (PFOF ¶ 64.)  On October 4, 2000, GBCI Deputy Warden Michael
Baenen wrote Konitzer that "[a] prohibition against make up at work is not a prohibition
against make up in your cell or other areas." (PFOF ¶ 65.)  According to Dr. Randi Ettner,
living as a female consolidates the female identity for the male-to-female transsexual and
creates harmony between outward appearance and inner self.[4] (PFOF ¶ 61.)

On June 15, 2000, Dr. Laurens D. Young, Chief Psychiatric Consultant to the
DOC, wrote Sharon Zunker informing her that in addition to Konitzer, two other inmates in
the DOC system on hormone therapy had mutilated their genitals and that such behavior
was typical for patients with GID. (PFOF ¶ 69.)

In early January 2001, Konitzer attempted suicide at GBCI by trying to hang
himself.  (PFOF ¶ 70.)  Konitzer felt depressed over incidents of sexual assault involving
a GBCI prison guard, and because he felt that he was not receiving the proper treatment
for his GID.  *Id.*  In late January 2001, Konitzer cut skin away from his scrotum and tied a

---

[4]Dr. Randi Ettner is a practicing clinical psychologist and a practicing forensic psychologist, who
provides diagnoses, psycho assessments, and treatments for persons with mental illnesses. (PFOF ¶ 50.)
Forensic psychologists are trained to understand the interface between psychology and the law. (PFOF ¶
51.) She has published numerous papers and books on the subject of GID, including research every two
years at the meeting of the Harry Benjamin International Gender Dysphoria Association. (PFOF ¶ 53.) Dr.
Ettner sees patients approximately 60% of the time and has acted in an expert capacity in legal matters
including four or five cases involving gender identity issues. (PFOF ¶¶ 54-55.) Dr. Ettner has authored
Confessions of a Gender Defendant: Psychologist's Reflection on Life Amongst the Transgendered, and
Gender Loving Care: A Guide to Counseling Gender Variant Clients. (PFOF ¶ 56.)

12

cord around his testes to cut off the blood flow because he hated living as a male. (PFOF ¶ 71.) Konitzer was transported to a hospital in Green Bay for treatment of the genital wound. (PFOF ¶ 72.) Prior to transferring Konitzer to the hospital, female guards at GBCI conducted a strip search. *Id.* Konitzer's self-mutilation required transfer to the University of Wisconsin Hospital where surgeons removed Konitzer's left testicle and portions of the right testicle after obtaining court authorization. The hospital went to court after Konitzer insisted on removal of both testicles. (PFOF ¶¶ 83-84.) Konitzer was taken to the WRC following release from the hospital. *Id.*

When Konitzer was transferred to the WRC, he had three sets of women's underwear, three bras, one nightgown, and six sets of men's bikini style underwear. (PFOF ¶ 73.) The WRC confiscated these items as unallowable property. *Id.* On February 19, 2001, Konitzer filed an offender complaint stating that Steve Hamilton of the WRC had confiscated the six sets of men's bikini underwear as female clothing and that they should be returned. (PFOF ¶ 74.) The complaint was affirmed and staff returned the underwear to Konitzer. *Id.*

An Inmate Classification Summary for the WRC states that during staffing for Konitzer's case on March 8, 2001, Dr. Arong stated she believes Konitzer is stable for transfer. (PFOF ¶ 75.) She added that it is possible he will attempt to hurt himself again due to his gender identity disorder. *Id.* On May 1, 2001, Deputy Warden Baenen wrote Konitzer stating: "You further raise the issue of wearing make up and being searched by female officers. Clearly you did do both of these at GBCI. The issue, however, is not whether this ever happened, but whether it was sanctioned as part of institutional policy

while you were here. The answer to that question is no, neither was sanctioned." (PFOF ¶ 76.)

On March 25, 2003, Dr. Kevin Kallas wrote to Konitzer, noting his six attempted self-castrations and self-penectomy. (Cothroll Decl. ¶ 4, Ex. 203, Bates No. 5402-03.) Dr. Kallas stated that "[t]his letter is in response to your correspondence with Governor Jim Doyle," and that "[y]ou state that treating you as a male has caused you six attempted self-castrations and one instance of attempting to cut your penis off." *Id.*

In July 2003, Konitzer attempted suicide at the WRC by standing in a bucket of water and dropping a plugged-in alarm clock. (PFOF ¶ 88.) Staff at the WRC turned off the power, however, before the alarm clock reached the water. *Id.* Shortly thereafter, Konitzer again attempted suicide by crushing his hyoid bone in his neck with a nylon cord. (PFOF ¶ 90.) Konitzer attempted suicide because he did not want to live life as a male. (PFOF ¶¶ 89,91.)

Konitzer's March 28, 2005, Revised Release Transfer Summary states that his self-abusive behavior does not result from any form of manipulation, but appears to result from a sense of hopelessness that causes self-destructive feelings. (PFOF ¶ 92.) WRC Security Director Canziani is aware of one of Konitzer's self-castration attempts and one of his suicide attempts (PFOF ¶ 93), and Director Bartow recalls Konitzer's suicide and castration attempts (PFOF ¶ 94). According to Dr. Tom Speech, Konitzer had a long history of attempted self-castration, which as a form of self-injury was a concern to the WRC staff. (PFOF ¶ 95.) Dr. Thomas Michlowski, a psychiatrist and Medical Director of the WRC, knows that attempted castration has been an issue for Konitzer from time to time, and is aware that Konitzer attempted suicide at the WRC. (PFOF ¶ 97.)

14

On May 15, 2006, in an effort to further alleviate his gender dysphoria, Konitzer attempted to castrate his remaining teste. (PFOF ¶ 209.) Konitzer's attempt resulted in his transfer to Theda Clark Medical Center in Neenah, Wisconsin. *Id.* There, on May 16, 2006, doctors surgically removed Konitzer's remaining testicle. *Id.*

Since May 17, 2006, shortly after his castration attempt, Konitzer has lived in a WRC cell containing a private toilet. (PFOF ¶ 210.) A window shutter over the door prevents other inmates from viewing Konitzer in compromising situations, such as when he uses the toilet, but staff are still able to see him during rounds. *Id.* Although some inmates have made comments to Konitzer about his living situation, none have been negative, nor has Konitzer been assaulted since May 17, 2006. *Id.*

Around the same time, on or about March 17, 2006, the WRC medical staff requested that Konitzer be referred to the University of Wisconsin endocrinology clinic ("UW") for "recommendations on dosages of medication, estrogen, etc." (*Id.*; Konitzer Suppl. Decl., Ex. 217.) The request further stated that the WRC "will be required to withdraw Estrogen. Please recommend method and associate [sic] medical problems." *Id.*

In September 2006, Dr. Roger Kulstad of the UW Hospital recommended that Konitzer receive Vaniqa cream, a hair growth retardant, for folliculitis (hair follicle infection) on his face. (PFOF ¶ 214.) In addition, Dr. Kulstad recommended Rogaine and a bra, noting with respect to the latter that Konitzer receive "a bra for adequate breast support. Breasts are Tanner IV consistent with adult female. This is medically necessary." *Id.* On September 28, 2006, UW Hospital issued an Endocrine-Diabetes Consult Note signed by the attending endocrinologist, Dr. Elaine M. Pelley. *Id.* The Note reiterates Dr. Kulstad's

15

previous recommendations regarding Vaniqa and a bra. *Id.* In the Note, Dr. Pelley stated

that she agreed "with [Dr. Kulstad's] findings and plan as outlined above." (*Id.;* Cothroll

Surreply Decl. ¶ 2, Ex. 218 at UW 467.)

### C. DOC Policy

The DOC has in place Executive Directive #68. (DFOF ¶ 72.) This directive

is entitled "Scope of Services for Treatment of Gender Identity Disorder."[5] (Bartow Dep.,

---

[5]Executive Directive #68 provides:

SUBJECT:      Scope of Services for the Treatment of Gender Identity Disorder

I.      Background

It is the policy of the Wisconsin Department of Corrections (DOC) to provide appropriate treatment services to offenders meeting the criteria for a diagnosis of gender identity disorder (DSM-IV 302.85). Practitioners shall take correctional and community standards of care into consideration when providing treatment services.

II.      Definitions

*Diagnostic and Statistical Manual*, 4th Edition, Revised (DSM-IV): The standard manual of psychiatric diagnoses and classification codes.

Gender Identity Disorder: A psychiatric disorder in which a person is not satisfied and is seriously dysphoric with regard to their anatomical gender. In general, this condition is a stable, nonviolent condition and not due to psychosis, but it may accompany other mental disorders.

Hormonal Therapy: The use of hormones to stimulate the development of secondary sexual characteristics such as enlargement of breasts and which may exert systemic effects such as body hair loss.

Sexual Reassignment Therapy: Treatment for gender identity disorder in which one or more of the following are used: hormonal medications, surgical procedures to alter a person's physical appearance so that he/she appears more like the opposite gender and psychological counseling.

II. [sic]  Guidelines

A.  No surgical procedures for the purpose of sexual reassignment shall be provided to any offenders incarcerated in the WDOC.

B.  After consultation with the Gender Identity Disorder Committee, hormonal therapy for severe gender dysphoria may be initiated by the WDOC physicians. The Gender Identity Disorder Committee will consult with a non-WDOC consultant before approving or denying a request from a WDOC physician for initiating hormonal therapy. If the Committee and the non-WDOC consultant do not agree regarding initiating hormonal therapy for severe gender dysphoria, the DOC Medical Director and non-WDOC Consultant will meet with the Secretary's Office to reach a decision.

16

C. An offender who is receiving hormonal medications as a part of an established sexual reassignment therapy regimen under the supervision of a medical doctor at the time of incarceration may be continued on hormonal medications provided that the offender cooperates with the DOC in obtaining confirmation of his/her previous treatment. If an offender chooses to discontinue hormonal medications and then wishes to restart hormonal medications, the committee referenced below will evaluate the request and make a determination.

D. The offender must agree to sign DOC-1163, Confidential Information Release Authorization, allowing DOC medical and mental health staff access to medical and mental health records regarding all prior treatment related to gender identity disorder.

E. Offenders identified or claiming to suffer from gender identity disorder shall have access to the full range of mental health therapies available through the Wisconsin DOC. They shall have access to therapies in which they may explore their ambivalence, confusion and conflict around sexual identity as well as those services focusing on enabling those with identifiable mental health problems to better adjust to institutional living.

F. Self-inflicted genital mutilation or other forms of self-mutilation are not consistent with successful sexual reassignment therapy.

*Facility Placement*

A. In the event that an offender who has completed a surgical sexual reassignment treatment program is committed to the DOC, that offender shall be placed in a correctional facility appropriate for his/her reassigned gender.

B. In general, offenders shall be placed in facilities in accordance with their gender as determined by their external genitalia.

*Name and Apparel for Inmates with Gender Identity Disorder*

A. The DOC shall use the name of the offender as it appears on the Judgement [sic] of Conviction. The only exception to a name change will be through an order of a judge to have the name of the offender legally changed after the Judgement [sic] of Conviction. A new Judgement [sic] of Conviction must be issued or the court order must specifically state "change all records".

B. Property and apparel shall be consistent with the offender's determined gender.

*Gender Identity Disorder Management and Treatment Committee*

A. *Composition*: The Committee shall be composed of the DOC Medical Director, the DOC Mental Health Director, the Bureau of Health Services Director or designee, an assigned doctoral prepared psychologist, and a Warden or designee. In addition, a medical specialist in the treatment of gender identity disorder from the community may be retained as a consultant on specific cases. If the offender is identified as a sex offender, the Chief Psychologist, Sex Offender Specialist shall participate as a member.

B. *Function*: The committee shall be convened to address issues in the management of individuals with gender identity disorder after review and referral by the medical director, mental health director or Bureau director. Inmates may be referred to the medical director, mental health director or bureau director to address issues of concern through the committee by institution Wardens or their designees.

The committee shall advise the medical director or treating physician on issues such as appropriate diagnoses, complications of treatment, management issues, and/or the design and implementation of a plan of care.

Sept. 9, 2004, Ex. 6.)  Executive Directive #68 was the result of a collaborative effort by DOC health services staff, DOC's chief psychiatrist, other DOC psychiatrists and psychologists, and members of the DOC executive staff. (DFOF ¶ 73.)  According to defendant Sharon Zunker, DOC Health Services Coordinator, the policy was based upon the input of the "executive staff who reviewed this policy and procedure, including wardens and other members of the executive staff at the time." (Zunker Dep. at 76.)  Executive Directive #68 was signed by then DOC Secretary Jon E. Litscher on December 17, 2002. (DFOF ¶ 74.)  Prior to January 24, 2006, the effective date of Wis. Stat. § 302.386(5m), Executive Directive #68 allowed for hormonal therapy to be initiated by a DOC physician for inmates with severe gender dysphoria. (DFOF ¶ 75.)

Gender dysphoria is a broader term that includes GID. (DFOF ¶ 77.)  Under Executive Directive #68, offenders are placed in facilities in accordance with their gender as determined by their external genitalia. (DFOF ¶ 78.)  The WRC has directed its staff to treat Konitzer as a male in all respects. (DFOF ¶ 80.)

The WRC will not deviate from general corrections practice regarding the management of an inmate's mental illness unless it considers the departure to be central to the mental illness at issue. (PFOF ¶ 100.)  Bartow, as the leader of the WRC, has decided that the WRC will not treat any male inmate as a female and will not do so in Konitzer's case because of DOC policy. (PFOF ¶ 101.)  Regarding the prospect of treating Konitzer as a female, Bartow maintains that "if our team was convinced and had a convincing argument that is what really needed to be done for his case, I would arrange to

---

(Bartow Dep., September 9, 2004, Ex. 6.)

have him go somewhere else, by whatever means it took, because we don't do that here." (Bartow Dep. at 136; PFOF ¶ 102.)

In discussing Konitzer's therapy sessions to address his disorders, Dr. Speech testified: "From our point of view, you're in a male correctional facility, and it looks like you're going to be there a very long time. And what we can do is help you adjust to that. We can help you cope with having a gender identity disorder under those circumstances." (Speech Dep. at 49-50; PFOF ¶ 109.) When asked whether he had explored the options of allowing Konitzer to wear makeup, to wear female attire or to be referred to as a female, defendant Dr. Speech testified: "We determined that since the Department of Corrections did not allow any of those things, that it would be inappropriate to allow Konitzer to do any of that here, because he's going to go back to an environment where he only stands to lose all of those things, which would be a significant setback to him, particularly given his emotional makeup and his diagnoses. That would be setting him up for failure when he returns. He would become extremely angry is our belief and we would be right back where we started, just setting him up for frustration." (Speech Dep. at 57-58; PFOF ¶ 110.)

In 2002, the WRC clinical staff suggested to DOC staff treatment strategies such as "allowing Mr. Konitzer to wear female clothing or undergarments as a reward for lack of self-mutilation, or having us pursue sex reassignment surgery." (Kallas Dep. at 62; PFOF ¶ 111.) On October 8, 2002, Dr. Speech wrote Dr. Kallas stating that he had "reservations about not having female staff present at searches. This provision was set up for our protection as much as for the protection of the inmates." (Speech Dep. Ex. 41, Bates No. 5444; PFOF ¶ 112.) Dr. Kallas testified that Dr. Speech made the recommendations for female clothing and sex reassignment surgery, but that the DOC would not implement

19

any of them because of the DOC policy and that the correctional environment would not allow the WRC's suggestions. (PFOF ¶ 113.) Konitzer continues to wear makeup and feminize his appearance at the WRC, despite the policy against him possessing and wearing feminine items. (PFOF ¶ 121.)

D. Expert Opinions

The WRC staff diagnosed Konitzer with the following DSM-IV Axis I diagnoses in addition to GID: cocaine dependence in remission in a controlled environment, post traumatic stress disorder, and major depression, as well as the DSM-IV Axis II diagnosis of personality disorder with cluster B traits. (DFOF ¶ 43.) Cynthia Osborne, a psychotherapist and assistant professor in the Department of Psychiatry & Behavioral Sciences at Johns Hopkins University School of Medicine, has a similar opinion and believes that Konitzer meets the criteria for DSM-IV Axis II diagnoses of antisocial personality and borderline personality disorder. (DFOF ¶¶ 44, 45.) Because of the presence of Axis II symptomatology, Osborne is uncertain whether Konitzer's GID is the "cause" of his disruptive, suicidal, or self-harming behaviors. (DFOF ¶ 54.)

In the view of Dr. Daniel Claiborn, who has a Ph.D. in counseling psychology and is a licensed psychologist in Kansas and Missouri, Konitzer manifests severe, chronic "Cluster B" personality disorders, characterized by self-centeredness, drama, volatile emotions, and erratic behaviors.[6] (DFOF ¶¶ 46,48.) Morever, Dr. Claiborn opines that these combined personality disorders (antisocial, borderline, histrionic, and narcissistic)

---

[6] It is undisputed that Dr. Claiborn did not interview Konitzer, despite stating that it was his practice to do so in almost every case in which he was retained as an expert, and that he only had not interviewed a subject when he was asked to review another expert's report or determine whether another evaluation of the subject was warranted. (Claiborn Dep. at 25-26, 51-52, 54.)

20

militate against honest self-exploration, trust, commitment, and taking responsibility for change. *Id.* Further, Dr. Claiborn believes antisocial personality disorder is Konitzer's most severe disorder. (DFOF ¶ 47.) It is Dr. Claiborn's opinion that Konitzer's treatment must be designed carefully to address GID in the context of severe and overlaying personality pathologies and that failure to do so will likely result in disappointing outcomes for Konitzer and the State of Wisconsin. (DFOF ¶ 49.)

    Randi Ettner, Ph.D., who was retained by Konitzer, recommends that Konitzer receive the following treatment for GID: (1) evaluation by a physician who specializes in the care of GID patients so that Konitzer's hormonal protocol can be accurately reconfigured; (2) follow-up with the same medical specialist every six months, or as necessary; (3) non–medical security examinations should be executed by female correctional personnel; (4) periodic access to a mental health care giver with expertise in treatment of this class of disorder, i.e. a member of the Harry Benjamin International Gender Dysphoria Association; (5) access to a modest amount of make-up; (6) use of female undergarments; (7) privacy toilet and showering; (8) the ability to use a female name in addressing oneself, and to be so addressed by others; (9) the ability to use products such as depilatories and/or hair growth stimulators that are harmless and enhance one's ability to live in the preferred gender role. (DFOF ¶ 50.) However, she does not know the exact status of Konitzer's medical treatment and it is beyond her experience to comment on Konitzer's particular hormone treatment. (DFOF ¶ 52.) Nonetheless, Dr. R. Ettner believes it is not malpractice for an endocrinologist to treat a patient who has GID even though they have not done that before. (DFOF ¶ 56.) Dr. R. Ettner does not have experience treating individuals while they

are incarcerated or in prison security issues or prison administration, and only interviewed Konitzer once at the WRC. (DFOF ¶ 55.)

In the opinion of Dr. Claiborn, physicians who are generally informed about transsexualism and consult with an endocrinologist are competent to help Konitzer make informed decisions about his treatment options. (DFOF ¶ 57.) Psychologists are not allowed to practice outside their areas of expertise, but, in Dr. Claiborn's opinion, education and familiarity are sufficient qualifications for a mental health provider to help Konitzer consider his options within the prison system. (DFOF ¶ 60.) Dr. Claiborn opines that mental health personnel should have an understanding of the prison resources and of techniques for helping individuals adjust to circumstances beyond their control, whatever those might be. *Id.* Mental health personnel in prisons and working with Konitzer should also have familiarity with personality disorders. *Id.*

In the opinion of Osborne, focusing Konitzer's treatment on adjustment rather than cross gender transition is a clinically sound and ethically wise stance. (DFOF ¶ 61.)

Frederic Ettner, M.D. was also retained by Konitzer and recommends that Konitzer receive the following protocol: (1) complete physical examination and laboratory testing including hormonal assessment; (2) HRT (hormone replacement therapy), specifically non-conjugated estrogens, i.e. estradiol valerate (bio-identical) in the form of patch, gel, or cream; (3) anti-androgen finasteride to block exogenous androgens and stimulate scalp hair and decrease body hair; (4) consistent follow-up every three months; and (5) coordination with psychiatrists and psychological recommendations. (DFOF ¶ 62.) It is the view of Dr. F. Ettner that a medical doctor may give Konitzer a complete physical examination and laboratory testing including hormonal assessment, and that it is not

22

necessary that the doctor have expertise in GID to perform this. (DFOF ¶ 65.) Dr. F. Ettner concedes that Konitzer probably could have conjugated estrogens for a period of time until stabilized, and then after a period of perhaps a year or two, could easily be transferred to a non-conjugated estrogen. (DFOF ¶ 66.)

According to defendants' expert Dr. Samuel Westrick, there are no "official" guidelines for the best medical treatment of male-to-female transsexuals but a few authors have published recommendations based on their considerable experience with these patients. (DFOF ¶ 63; Westrick Dep., May 16, 2005, Ex. 88 at 2.) Consensus exists among experts that estrogen therapy is a cornerstone of treatment for a male-to-female individual with GID, while nuances of type and dose remain controversial, or at least subject to much diversity of opinion. (DFOF ¶ 64.)

From a psychiatric perspective, hormones are not prescribed to a male-to-female GID patient for feminization per se. (DFOF ¶ 67.) Rather, hormones are prescribed to reduce symptoms of dysphoria and to improve function. *Id.* Osborne also opines that while feminization may be the male-to-female GID patient's desire, the clinically neutral clinician is invested only in assisting the patient to function better, to adjust to his environment, and to ameliorate to the greatest extent possible dysphoria and any co-morbid symptoms. (DFOF ¶ 68.)

With regard to the administration of anti-androgen finasteride to block exogenous androgens, stimulate scalp hair and decrease body hair, Dr. F. Ettner believes that finasteride is not absolutely necessary for the treatment of transgendered males to females. (DFOF ¶ 69.) Dr. F. Ettner testified:

> In the standards of care, it is recommended that it [finasteride] be utilized. Is it absolutely necessary? If it wasn't available in her part of the universe, no, it would not be absolutely necessary. One could utilize other hormones to help treat the gender dysphoria, but certainly if it is available, it should be looked into and utilized.

(F. Ettner Dep., May 6, 2005, at 37.) Similarly, in the opinion of Dr. Westrick, it does not appear there is any rationale to prescribe an anti-androgen agent to Konitzer because there are no androgens in Konitzer's system causing masculinization. (DFOF ¶ 70.)

As for coordination of Konitzer's psychiatrists and his psychological recommendations, Dr. F. Ettner acknowledges that phone calls, e-mails or any type of coordination with someone such as an endocrinologist and a treating psychiatrist would satisfy Konitzer's treatment needs. (DFOF ¶ 71.) Further, Dr. F. Ettner opines that refusing to provide Konitzer with the real-life experience puts him at risk for castration and self harm, and that the frustration of living with an untreated gender condition always has disastrous consequences. (PFOF ¶ 118.) Dr. F. Ettner testified:

> Standard of care does not specify a list of particular ingredients that will create the image that Donna Down Konitzer needs to establish a level of well-being. It does, however, provide a guideline, and in that guideline, the thrust of it is to help these people consolidate an identity that is ego-syntonic and causes them to feel comfortable and safe in this world, therefore, the real-life experience, so they get practice in living 24 hours a day, seven days a week in their preferred gender.

(F. Ettner Dep. at 101; PFOF ¶ 122.)

Dr. Randi Ettner's opinion is that certain things, such as depilatories and hair growth stimulators, which may appear superficial or not medical, play a very prominent role in the treatment of GID and allow the patient to move from a discordant and uncomfortable life that interferes with their functioning into a safer and more comfortable gendered

24

ecology. (PFOF ¶ 123.) Moreover, Dr. R. Ettner opines that Konitzer has not received the minimum standard of care for the treatment of GID. (PFOF ¶ 124.) Indeed, she maintains that many of Konitzer's interventions have been counter-therapeutic. *Id.* It is the view of Dr. R. Ettner that the overarching goal of Konitzer's treatment is to assist him to adapting to life as a male.

Cynthia Osborne advised the DOC to consider: (1) use of the inmate's chosen name and feminine pronouns by all treatment, security and administrative personnel, which can be done without pursuit of a legal name change; (2) the wearing of feminine apparel, such as undergarments, in ways that minimize security risks, for example, Konitzer could be allowed cross dressing opportunities in the privacy of his own room; (3) the use of some items of light makeup in the privacy of his room; (4) the use of Rogaine, hair removal wax, and other products that may assist Konitzer in quieting the dysphoria; (5) the opportunity to shower privately; (6) the assignment of female guards whenever possible to conduct strip searches; and (7) the thorough training of institutional staff to understand GID. (PFOF ¶ 126.) Additionally, Osborne recommends that the DOC consider allowing feminizing strategies that do not constitute a threat to security, interfere with daily operations of prison programs, or undermine the safety, functioning, and options of inmates. (PFOF ¶ 127.) According to Osborne, "I have no clinical opposition to this inmate or some other inmates being accommodated in their gender preferences to a reasonable extent. If it does not put them at risk, or other people at risk, I have no objection." (PFOF ¶ 128.) She added that her opinion was based on the consensus of the collegial community with which she is affiliated. (PFOF ¶ 130.) This collegial community consists of Osborne's colleagues at Johns Hopkins and other colleagues around the nation with whom she consults and shares

25

treatment opinions. *Id.* Every group that operates in this country and abroad in the area of GID is familiar with the Standards of Care and recognizes them as guidelines. (PFOF ¶ 131.)

Osborne admits that the literature says it is appropriate to address a GID patient by their preferred gender name, but she believes it is bad clinical advice. (PFOF ¶ 132.) The only literature that supports her opinion is her article on split gender identity, which was the first to advocate that viewpoint. *Id.* The article on split gender identity was based upon Osborne and her co-author's observational research and no empirical data. (PFOF ¶ 133.) In defendant Dr. David Burnett's understanding of the Standards of Care, the real-life experience is a legitimate form of treatment for a GID patient, depending upon that person's individual situation. (PFOF ¶ 134.)

Dr. Claiborn testified that, more often than not, he interviews individuals when he prepares an expert report. (PFOF ¶ 135.) However, Dr. Claiborn did not interview Konitzer prior to preparing his report. (PFOF ¶ 136.) Dr. Claiborn has never published or written books on GID, and has seen only about thirty patients with GID over the past twenty years, does not subscribe to any journals specific to GID or belong to any associations specific to GID. (PFOF ¶ 137.) Dr. Claiborn testified that the DSM is an economic and political process, and that many so-called disorders are included in the DSM that are not really disorders or diseases at all and he would include GID as one of those. (PFOF ¶ 138.)

Citing *Estelle v. Gamble*, 429 U.S. 97 (1976), but admitting that he did not read the case, Dr. Claiborn understands the Eighth Amendment to the United States Constitution to prohibit deliberate indifference to serious medical needs. (PFOF ¶ 140, 142.) Dr. Claiborn explained that "serious medical needs" as outlined in his report focuses on the

26

word medical and that a medical need would be one that was resolved through pharmacological or surgical treatment. (PFOF ¶ 141.) In his experience, Dr. Claiborn testified that patients with borderline personality disorder that practice self-mutilation usually do so in the form of wrist slitting. (PFOF ¶ 143.) Dr. Claiborn has never in his experience seen, or heard, of a patient with borderline personality disorder who has attempted genital mutilation, and believes it unusual to see any kind of self-mutilation with a person with antisocial personality disorder. (PFOF ¶ 144.) He does not think that female security examinations, makeup, female clothing, toilet and shower privacy, and referring to Konitzer by a female name is necessary because GID is not a disorder or disease that requires treatment. (PFOF ¶ 145.) Dr. Claiborn does not consider himself to be an expert in prison security, and cannot comment on the issue of what prisons can and cannot do since that is not his area of expertise. (PFOF ¶ 146.)

Osborne, who also stated that she is not an expert in prison security, testified:

> A. The presence of sociopathy tendencies does not mean someone has necessarily acted on those behaviorally. This is all a matter of clinical judgment. And I would not, I don't think I have ever recommended full cross gender transition for someone who has severe personality disorder traits.
>
> Q. So when you state the Harry Benjamin Standards of Care include a criterion of being crime free, are you referring to, is it your impression that the Harry Benjamin standards require crime free criterion for sex reassignment surgery?
>
> A. Yes. I think it is implicit.
>
> Q. Would you say that the Harry Benjamin Standards of Care require that a person be crime free for treatments of gender identity disorder other than sex reassignment surgery?

27

A.  This criteria right here is for hormones. That is a requirement for hormone therapy. So that precedes surgery.

Q.  So you are saying then in general the Harry Benjamin Standards of Care require criteria of being crime free?

A.  Require is a strong word for something that is a non-regulatory guideline. But this is a recommended way by this foundation of treating GID. And it includes this criterion, suggested criterion that sociopathy be under control. A person who is actively acting out or in prison because they have acted out I would say that is just a major logical contraindication.

(PFOF ¶ 141; Osborne Dep., May 17, 2005, at 134-36.)  Osborne opines:

I recommend that the DOC consider allowing feminizing strategies that don't constitute a threat to security, or interfere with daily operations of prison programs, the safety or functioning of inmates, and that don't jeopardize the future options of the inmate. Some accommodation will reduce power struggles, invite better cooperation, and raise the potential for smoother sailing for both the inmate and the DOC. But accommodating strategies should not be confused with medically necessary treatments. Of the hundreds of gender identity disordered patients I have treated and the dozens in my current caseload, none has these kinds of products and services funded by third party payers.

(Osborne Dep., Ex. 95 at 43.)

Dr. R. Ettner testified that simply because a particular treatment is cost prohibitive, that does not mean it is not medically necessary. (PFOF ¶ 151.)  There are some people who do not have insurance, which makes any medically necessary procedure prohibitive for them.  *Id.*  Moreover, even if the DOC were to change its policy and permit Konitzer to wear makeup, the final authority as to whether Konitzer could wear makeup at the WRC rests with Bartow, who is not a clinician. (PFOF ¶ 153.)

Dr. Santos-Borja testified:

Q. . . . Konitzer's self-abuse and self-harm appear to result from a sense of hopelessness that caused self-destructive feelings. What's your sense of what this hopelessness is?

A. Hopelessness about being confined in a - - his identity as a male, her identity, hopelessness in terms of being confined in prison for a long, long time and not being able to do anything to be able to live as a female. Also some relationships. I don't know, problems, those kinds of things.

Q. So hopelessness in the sense that Inmate Konitzer has gender identity disorder and can't do anything about it?

A. It's a general sense of hopelessness. It's cumulative. I wouldn't say that it's just because of that particular thing. I think a lot of things makes [sic] Konitzer hopeless. He has a tendency to seek out relationships and there's, you know, very little chance of having a really long-lasting relationship in this kind of setting.

(Santos-Borja Dep., April 27, 2005, at 69-70.)

Co-morbid disorders mean that an individual has more than one disorder, such as antisocial personality disorder and depression, at the same time. (PFOF ¶ 155.) Dr. R. Ettner would not approach a patient who had GID any differently because that patient might also have other co-morbid personality disorders such as borderline personality disorders. (PFOF ¶ 156.) Just like a medical doctor might see diabetes and GID and Raynaud's syndrome in the same patient, he would not refuse treatment for anyone of those conditions just because they exist in a person simultaneously. (PFOF ¶ 157.) Osborne testified that she is not aware of any antisocial or borderline patient who has auto-castrated, but that she has had GID patients who have done so. *Id.*

Dr. R. Ettner interviewed Konitzer at the WRC and administered the MMPI. (PFOF ¶ 159.) The MMPI confirms that Konitzer is at risk for suicide or castration attempt because it indicates a lot of suicidal ideation and depression. *Id.* The value of the MMPI is that it is normed (compares results against the same group) for correctional settings.

29

(PFOF ¶ 160.)  If MMPI test scores are not normed to a matched group that resembles the individual, the scores are meaningless. *Id.*

Osborne did not administer the MMPI to Konitzer because she is not qualified to administer it. (PFOF ¶ 161.)  However, she agrees that the MMPI is normed for the prison population. *Id.*  Instead, Osborne administered the Brief Symptom Inventory, the Derogatis Affects Balance Scale, and the NEO-P-I-R to understand Konitzer's psychological distress. (PFOF ¶ 162.)  None of these psychological tests are normed for prison populations. *Id.*

E.  Security

The risk of danger to staff and inmates in a correctional environment is higher than most aspects of normal society. (DFOF ¶ 86.)  The nature of the correctional environment, particularly in view of recent severe population increases, represents a density of human living conditions that is only comparable to the worst of human slums in major urban areas around the world. *Id.*  The human living conditions in correctional facilities are further aggravated in that this density consists of hundreds of individuals at each institution who have led lives of severe social dysfunction in the form of drug abuse, violence, unstable family relationships, and mental health disorders. (DFOF ¶ 87.)  In high security prison populations, nearly forty percent of the inmates have committed acts of violence while incarcerated. (DFOF ¶ 88.)  The risk that inmates will commit acts of violence while incarcerated is dramatically elevated by a number of conditions that may or may not be present in the prison population. (DFOF ¶ 89.)  One is the presence of lethal weapons in the possession of inmates, another is the possession and sale of illegal drugs by inmates, and another is the sexual behavior among inmates. *Id.*  It is not unusual to find that over fifty percent of the incidents in prison are related to sexual partnering among inmates where

30

conflict has developed in the form of jealous partners, failed relationships, or competition from other inmates. (DFOF ¶ 90.) The level of risk of incidents of violence in prison is further elevated when any of the participants has a history of violent, assaultive behavior, such as Konitzer. (DFOF ¶ 91.)

It is the mission and obligation of all American correctional systems to protect inmates and staff from physical harm. (DFOF ¶ 92.) Where inmates show an inclination to be sexually active towards one another, it is common practice for staff to investigate, to be aware, and to take active measures in terms of prevention. (DFOF ¶ 93.) Inmate sexual activity is commonly the subject of administrative discipline. *Id.* Additionally, corrections staff may elect to separate inmates by a change of cell assignment or cell house assignment. (DFOF ¶ 94.) Where violence appears imminent, inmates may be segregated from others. *Id.* These are continual practices in an effort to keep the peace in correctional institutions. *Id.*

The movement of contraband is a security risk at the DOC and the WRC. (DFOF ¶ 110.) Due to the WRC's open treatment philosophy, inmates are moving from area to area in the facility, and some of the inmates are highly dangerous. (DFOF ¶ 111.) The movement of contraband is an even greater concern at the WRC because inmates are housed there to receive programming for mental health and/or behavioral issues, and the WRC does not typically hold inmates in long-term segregation. (DFOF ¶ 112.)

Strip searches are conducted at the WRC when there is reason to believe that contraband could be concealed on the clothing or body of an inmate. (DFOF ¶ 115.) These searches are required any time an inmate leaves or enters the WRC or any time that an inmate is brought to a secure unit. (DFOF ¶ 116.) Strip searches are necessary under

31

these circumstances to prevent contraband from being brought into the facility and on secure units. It is particularly important to prevent contraband from being brought on to secure units at the WRC because these are disciplinary units that house highly assaultive or abusive inmates, and contraband must be controlled to prevent injury to inmates and staff. (DFOF ¶ 117.)

Personal searches or pat searches on inmates are required randomly; and each WRC unit has criteria for how many random pat searches staff are expected to conduct. (DFOF ¶ 118.)  The WRC staff is expected to stop inmates and to conduct pat searches randomly.  Pat searches are also conducted whenever inmates leave work areas, as well as kitchen and maintenance areas to ensure that inmates are not smuggling tools, food, or other things to and from their housing unit. (DFOF ¶ 119.)  Moreover, pat searches are done as a general security practice. (DFOF ¶ 120.)

The WRC adheres to the DOC administrative rules when conducting strip searches and pat searches. (DFOF ¶ 121.)  These rules require that a person of the same sex as the inmate being searched shall conduct the strip search, although any staff member may conduct pat searches.

DOC Security Chief Daniel A. Westfield testified that contraband can be concealed in body cavities, or taped to the body.  For these reasons, strip searches must be conducted in accordance with DOC rules and cannot be compromised for any inmate, including Konitzer.  Such searches are unpleasant for both the inmate and the staff. (DFOF ¶ 135.)  During a strip search, inmates are required to completely expose body orifices for visual inspection. The entire body of the inmate is to be checked, including armpits, hands, pubic region, between toes, soles of feet, rectum, and inner portion of legs. Consequently,

32

DOC rules require that a person of the same sex as the inmate being searched conduct the strip search.

> Executive Directive #68 states in part:
>
> The DOC shall use the name of the offender as it appears on the Judgement [sic] of Conviction. The only exception to a name change will be through an order of a judge to have the name of the offender legally changed after the Judgement [sic] of Conviction. A new Judgement [sic] of Conviction must be issued or the court order must specifically state "change all records".

(Bartow Dep., Sept. 9, 2004, Ex. 6.)

Konitzer's name appears as "Scott A. Konitzer" on his Judgments of Conviction dated June 11, 1997, and December 16, 1994. (DFOF ¶ 140.) Konitzer is in a male institution; was incarcerated under the name of Scott Konitzer and the WRC staff is directed not to address Konitzer by any female name or pronoun. *Id.* However, the WRC partially accommodates Konitzer's request to be referred to as a female is by referring to him as "Konitzer," avoiding the use of Scott. (DFOF ¶ 149.)

Pursuant to Executive Directive #68, property and apparel allowed to an inmate shall be consistent with the offender's determined gender. (DFOF ¶ 158.) Gender, under Executive Directive #68, is determined by the inmate's external genitalia. Konitzer is not authorized by the DOC to obtain and wear female clothing while housed at the WRC. (DFOF ¶ 159.)

While housed at the WRC, Konitzer is allowed items of clothing and property that males in the DOC prison system are typically allowed. (DFOF ¶ 162.) The WRC conforms its policies related to inmates housed at this facility and allowable clothing and property to the DOC policies and procedures, because eventually most DOC inmates

33

housed at the WRC are returned to a DOC correctional institution. The WRC also conforms its policies and procedures related to an inmate's allowed clothing and property to DOC's policies because it is managed as a prison and seeks to avoid wasting resources such as clothing and personal items that an inmate may not retain following transfer to a DOC correctional institution. (DFOF ¶¶ 163-164.)

DOC 309 IMP #2, "Subject: Inmate Personal Clothing," provides a listing of female and male clothing items that DOC inmates are allowed to obtain and possess. (DFOF ¶ 172.) The IMP #2 includes a specific listing of allowed personal clothing items to be obtained and possessed by male and female inmates. (DFOF ¶ 173.) The IMP #2 indicates that only traditional style briefs and boxers are permitted for male inmates, and only traditional style briefs are permitted for female inmates. The IMP #2 does not allow for male inmates to have bras. (DFOF ¶ 174.)

Each WRC housing unit has a separate shower area. (DFOF ¶ 189.) The shower area on Konitzer's housing unit consists of two individual shower stalls with curtains for privacy. These shower stalls are in an area that is "L" shaped, and are located on the right-hand side of the entrance and walkway leading to the stalls. The shower stalls are open daily from 6:00 a.m. until approximately 9:00 a.m. (DFOF ¶ 190.) Only two inmates may shower at a time in the separate shower stalls. WRC unit staff have accommodated Konitzer's request for separate showering hours on his unit, although this has not been provided uniformly. (DFOF ¶191.) Currently Konitzer is allowed to take a daily shower and is able to use the shower area alone with the exterior door leading to the shower stalls secured. (DFOF ¶ 192.) This accommodation for private showering is included in Konitzer's Release/Transfer Summary Inmate form dated March 28, 2005. (DFOF ¶ 193.) The DOC

34

represents that it intends to allow Konitzer to shower separately from other inmates when or if he is transferred back to a DOC institution. (DFOF ¶ 194.)

The restroom (toilet area) floor plan on Konitzer's housing unit includes urinals and three individual stalls with doors that secure similar to a public restroom; however, the door to the restroom area is opened to the hallway.[7] (DFOF ¶ 195.)  Konitzer may use the individual stall and secure the door when using this facility.

In January 2004, Dr. Don S. Schalch, an endocrinologist from the University of Wisconsin Hospital and Clinics recommended that Konitzer be prescribed Rogaine for hair loss.  (DFOF ¶ 200.)  Dr.  Schalch did not believe that Rogaine was necessary to treat functional impairment Konitzer may have. (DFOF ¶ 201.) Rather, it was Dr. Schalch's clinical judgment that it was reasonable for Konitzer to use Rogaine to enhance the amount of his scalp hair.

The DOC considered Dr. Schalch's recommendation to provide Konitzer with the non-formulary medication, Rogaine, but refused to provide it because it was considered a cosmetic for hair loss, and thus would not be a covered benefit provided by the DOC. (DFOF ¶ 203.)  Further, the WRC determined that it was not in Konitzer's best interest for it to provide Rogaine, if the treatment would not be allowed to continue following any transfer back to a DOC institution. (DFOF ¶ 204.)  Furthermore, female inmates housed at Taycheedah Correctional Institution are not permitted Rogaine or any other type of hair growth stimulators except for medical purposes, and not allowed to purchase and/or use products to decrease or remove unwanted body hair, except for disposable razors. (DFOF

---

[7] As indicated above, since Konitzer's May 17, 2006 castration attempt, he has lived in a cell at the WRC containing a private toilet. (PFOF ¶ 210.)

¶¶ 205, 207.) There have been no instances where depilatory products, Rogaine, or Prepuce (finasteride) have been approved for use by any DOC inmate or prescribed for use by any DOC physician or medical professional for the treatment of hair loss. (DFOF ¶ 208.) In any event, Dr. Claiborn opines that hair removal and hair growth products are not required or necessary for Konitzer's mental health. (DFOF ¶ 209.)

Dr. Gerald Wellens, the former Chief Psychologist at GBCI, oversaw the psychological staff and programs at GBCI. (PFOF ¶ 171.) Dr. Wellens also provided direct psychological services to inmates at the institution. *Id.* Dr. Wellens became involved with Konitzer's case in the fall of 1999 following a self-castration attempt by Konitzer. (PFOF ¶ 172.) At that time, Konitzer had not begun female hormone therapy. *Id.* In his entire experience in the DOC, this was the only castration attempt that came to Dr. Wellens's attention. *Id.* Initially, Dr. Wellens referred to Konitzer as "Scott" or "Mr. Konitzer." (PFOF ¶ 173.) After Konitzer corrected him, he quickly began using Donna Dawn or Ms. Konitzer in Konitzer's presence. *Id.* However, Dr. Wellens was not able to do so in other settings. *Id.* GBCI would not permit the use of Donna Dawn in any context, and he, along with all staff, was verbally ordered by GBCI's warden at the time, Daniel Bertrand, not to refer to Konitzer as "Donna Dawn" or "DD." *Id.*

In December 1999, Konitzer was placed on female hormone therapy. (PFOF ¶ 174.) Following the initiation of female hormone therapy, Dr. Wellens observed female development, such as breasts. *Id.* While the hormone therapy provided some relief, Konitzer remained distressed because he was not allowed to wear makeup or a bra, and could not be referred to by his preferred female name. *Id.*

36

According to Dr. R. Ettner, a gynecomastia vest, a supportive undergarment designed for male breast development, fails to substitute for a bra inasmuch as it does not provide Konitzer with an ego-syntonic state of mind. (PFOF ¶ 179.)  It would not satisfy the recommendation that Konitzer be provided with a bra. *Id.*  The importance of the female attire is to provide Konitzer with an ego-syntonic state of mind. *Id.*  Canziani testified that if you provide one inmate with a bra, then others will want them or be able to order them. (PFOF ¶ 188.)

Konitzer is classified as a low risk for escape.[8]  (PFOF ¶ 191.)  WRC staff are supposed to check the identification of persons leaving the WRC. (PFOF ¶ 192.)  Women prisoners at Taycheedah Correctional Institution (TCI) are permitted to wear makeup, which would present concerns over feigning injury. (PFOF ¶ 193.)

Staff refusal to treat Konitzer as a female causes him a great deal of pain. (PFOF ¶ 197.)  When staff refer to him as a male, it defeats his self-image and serves as a constant reminder of feeling that he is trapped in the wrong body. *Id.* Konitzer believes there is nothing more disrespectful and painful than the actions by WRC staff which reinforce his biological male status. *Id.*

On July 2, 2002, Phil Kingston, Warden at Columbia Correctional Institution, wrote a letter to Konitzer. (PFOF Amended ¶ 206.)  In the letter, Kingston states that he reviewed Konitzer's correspondence about a job denial. *Id.* Kingston further states that

---

[8]Konitzer's Program Review Inmate Risk Assessment, dated January 26, 2001, indicates a "Low" rating under the escape history category and notes a 1991 escape attempt.  This low rating is in contrast to the defendants' characterization of Konitzer as high-risk for escape given Konitzer's sentence length and prior escape attempt.  (*See* DFOF ¶ 180.)  The facts must be taken in Konitzer's favor.

37

CCI's Security Director, Tim Douma, stated that "there is no security issue regarding your appearance, presentation, or lifestyle issues." *Id.*

On January 24, 2006, Wis. Stat. § 302.386(5m) became effective. Section 302.386(5m), which codifies the Inmate Sex Change Prevention Act, 2005 Wis. Act 105, was prompted by this lawsuit.

On December 1, 2005, Dr. Speech wrote to Konitzer regarding his statement that his treatment at the WRC did not meet the Standards of Care:

> Your request presumes we are or will be providing you treatment for the gender identity disorder; we have consistently said such treatment is outside the realm of expertise and that we did not consider this a focus of treatment for you here at WRC. Unless the court says otherwise, you are not here for GID treatment.

(Cothroll Suppl. Decl., Ex. 213.)

On or about March 24, 2006, the WRC stopped selling "Majic Shave" in its canteen. (PFOF ¶ 211.) Majic Shave is a cream that removes hair without requiring a razor. In other words, it is a type of "depilatory." *Id.* Currently Majic Shave is sold in at least two DOC institutions, Waupun Correctional Institution and Oshkosh Correctional Institution. *Id.*

### III.  ANALYSIS

The defendants contend that:  (1) they are entitled to judgment as a matter of law on Konitzer's medical experts' recommendations 1-10 and 12-14 for injunctive relief because there is no evidence that the defendants have or would be deliberately indifferent to any serious medical need Konitzer may have absent such injunctive relief[9]; and (2) the

---

[9] The defendants do not contend that recommendation 11, that Konitzer continue on hormone replacement therapy, is ripe for summary judgment. According to the defendants, given the new law, Wis. Stat. § 302.386(5m), that prevents the DOC from continuing the administration of hormones to inmates,

38

CCI's Security Director, Tim Douma, stated that "there is no security issue regarding your appearance, presentation, or lifestyle issues." *Id.*

On January 24, 2006, Wis. Stat. § 302.386(5m) became effective. Section 302.386(5m), which codifies the Inmate Sex Change Prevention Act, 2005 Wis. Act 105, was prompted by this lawsuit.

On December 1, 2005, Dr. Speech wrote to Konitzer regarding his statement that his treatment at the WRC did not meet the Standards of Care:

> Your request presumes we are or will be providing you treatment for the gender identity disorder; we have consistently said such treatment is outside the realm of expertise and that we did not consider this a focus of treatment for you here at WRC. Unless the court says otherwise, you are not here for GID treatment.

(Cothroll Suppl. Decl., Ex. 213.)

On or about March 24, 2006, the WRC stopped selling "Majic Shave" in its canteen. (PFOF ¶ 211.) Majic Shave is a cream that removes hair without requiring a razor. In other words, it is a type of "depilatory." *Id.* Currently Majic Shave is sold in at least two DOC institutions, Waupun Correctional Institution and Oshkosh Correctional Institution. *Id.*

### III.  ANALYSIS

The defendants contend that:  (1) they are entitled to judgment as a matter of law on Konitzer's medical experts' recommendations 1-10 and 12-14 for injunctive relief because there is no evidence that the defendants have or would be deliberately indifferent to any serious medical need Konitzer may have absent such injunctive relief[9]; and (2) the

---

[9] The defendants do not contend that recommendation 11, that Konitzer continue on hormone replacement therapy, is ripe for summary judgment. According to the defendants, given the new law, Wis. Stat. § 302.386(5m), that prevents the DOC from continuing the administration of hormones to inmates,

38

court should decline to issue injunctive relief and should not adopt the recommendations that only female officers conduct strip searches of Konitzer, Konitzer be provided with makeup and female undergarments, Konitzer be addressed by a female name, and Konitzer be allowed the use of hair removal/growth products because such recommendations are contrary to the WRC and the DOC's legitimate institutional interests and beyond the relief allowed under the Prisoner Litigation Reform Act.

Konitzer contends that: (1) as a matter of law, his GID is a serious medical need for which he is entitled to treatment under the Eighth Amendment; (2) summary judgment should be denied because his treatment by the defendants does not stem from any medical judgment but rather strict adherence to Directive #68; (3) there is a material factual dispute as to whether his GID requires deference to administrative decisions based on vague security risks and theoretical management issues; (4) *Rooker-Feldman* does not apply because he is not seeking review or rejection of the state court's denial of his petition for a legal name change; and (5) his hormone treatment should be established and closely monitored.

To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); see also *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

---

and the DOC's obligation to follow the new law, recommendation 11 creates a disputed issue of material fact. (Defs.' Br. at 4, n.2.)

39

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward,* 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). Factors that indicate a serious medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gutierrez,* 111 F.3d at 1373 (citations omitted). A medical condition need not be life-threatening to qualify as serious and to support a § 1983 claim, providing the denial of medical care could result in further significant injury or in the unnecessary infliction of pain. *See Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999); *Gutierrez,* 111 F.3d at 1371.

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake,* 157 F.3d 465, 474 (7th Cir. 1998). Neither negligence nor gross negligence is a sufficient basis for liability. *See Salazar v. City of Chicago,* 940 F.2d 233, 238 (7th Cir. 1991). A finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless." *Chapman,* 241 F.3d at 845 (citing *Farmer,* 511 U.S. at 840-42).

A.  Relevant Case Law

40

As an initial matter, the court recognizes that claims regarding GID, although unusual, are not unprecedented:

> In view of the general lack of public knowledge and understanding of gender identity disorders, the idea that an imprisoned male murderer may ever have a right to receive female hormones and sex reassignment surgery may understandably strike some as bizarre. However, Kosilek's claims raise issues involving substantial jurisprudence concerning the application of the Eighth Amendment to inmates with serious medical needs. This case requires the neutral application of the principles that emerge from that jurisprudence to the facts established by the evidence in this case.

*Kosilek v. Maloney,* 221 F. Supp. 2d 156, 160 (D. Mass. 2002). The court turns to a review of case law containing claims brought by prisoners with GID issues.

The Seventh Circuit Court of Appeals has issued two opinions on this topic. In *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987), the court held that an inmate stated a valid claim under the Eighth Amendment in connection with denial of medical treatment for transsexualism, reversing the lower court's dismissal of the complaint for failure to state a claim. The prisoner in that case was a biological male who underwent nine years of estrogen therapy before incarceration. *Id.* at 410. Once incarcerated the inmate was denied all medical treatment—chemical, psychiatric or otherwise—for his GID and related medical needs. *Id.* In concluding that the complaint stated a claim, the court found that transsexualism was a serious medical need. *Id.* at 411-13. In doing so it defined transsexualism as:

> "a condition that exists when a physiologically normal person (i.e., not a hermaphrodite - a person whose sex is not clearly defined due to a congenital condition) experiences discomfort or discontent about nature's choice of his or her particular sex and prefers to be the other sex. This discomfort is generally accompanied by a desire to utilize hormonal, surgical, and civil

41

procedures to allow the individual to live in his or her preferred sex role. The diagnosis is appropriate only if the discomfort has been continuous for at least two years, and is not due to another mental disorder, such as schizophrenia . . . . [S]ee generally American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, § 302.5x (3d ed. 1980); Edgerton, Langman, Schmidt & Sheppe, *Psychological Considerations of Gender Reassignment Surgery*, 9 Clinics in Plastic Surgery 355, 357 (1982); Comment, *The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma*, 7 Conn. L. Rev. 288, 288 n.1 (1975); Comment, *Transsexualism, Sex Reassignment Surgery, and the Law*, 56 Cornell L. Rev. 963, 963 n.1 (1971)."

*Id.* at 411-12 (quoting *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1083 n.3 (7th Cir. 1984)) (alteration in original). Additionally, the court determined that the complaint contained allegations indicating that the defendants were deliberately indifferent to that need because they "failed to provide the plaintiff with any kind of medical treatment, not merely hormone therapy, for her gender dysphoria." *Id.* at 413. The court went on to say,

We therefore conclude that plaintiff has stated a valid claim under the Eighth Amendment which, if proven, would entitle her to some kind of medical treatment. It is important to emphasize, however, that she does not have a right to any particular type of treatment, such as estrogen therapy which appears to be the focus of her complaint. The only two federal courts to have considered the issue have refused to recognize a constitutional right under the Eighth Amendment to estrogen therapy provided that some other treatment option is made available. *See Supre v. Ricketts,* 792 F.2d 958 (10th Cir.1986); *Lamb v. Maschner,* 633 F. Supp. 351 (D. Kan. 1986). Both of these courts nevertheless agreed that a transsexual inmate is constitutionally entitled to some type of medical treatment.

In *Supre v. Ricketts,* the plaintiff, an inmate in the Colorado Department of Corrections, was examined by two endocrinologists and a psychiatrist. These doctors considered estrogen treatment, but ultimately advised against it, citing the dangers associated with this controversial form of therapy.

Instead they prescribed testosterone replacement therapy and mental health treatment consisting of a program of counseling by psychologists and psychiatrists. Given the wide variety of options available for the treatment of the plaintiff's psychological and physical medical conditions, the Tenth Circuit refused to hold that the decision not to provide the plaintiff with estrogen violated the Eighth Amendment as long as some treatment for gender dysphoria was provided. Similarly, in *Lamb v. Maschner,* the plaintiff, an inmate at the Kansas State Penitentiary, had been evaluated by medical doctors, psychologists, psychiatrists and social workers and was undergoing some type of mental treatment. As a result of this treatment, the court held that the defendant prison officials were not constitutionally required to provide the plaintiff with pre-operative hormone treatment and a sex change operation.

The courts in *Supre* and *Lamb* both emphasized that a different result would be required in a case where there had been a total failure to provide any kind of medical attention at all. That is precisely the type of case before us. We agree with the Tenth Circuit that given the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment. But no such informed judgment has been made here. While we can and will not prescribe any overall plan of treatment, the plaintiff has stated a claim under the Eighth Amendment entitling her to some kind of medical care.

*Id.* at 413-14.

The other Seventh Circuit case is *Maggert v. Hanks,* 131 F.3d 670 (7th Cir. 1997). In *Maggert*, the district court's dismissal of the action was affirmed because the prisoner failed to create a genuine issue of material fact that he had GID. *Id.* at 671. However, the Court of Appeals went on to address "a broader issue, having to do with the significance of gender dysphoria in prisoners' civil rights litigation." *Id.* First, it defined gender dysphoria, "the condition in which a person believes that he is imprisoned in a body

43

of the wrong sex, that though biologically a male (the more common form of the condition)

he is 'really a female,'" as a "serious psychiatric disorder." *Id.* Treatment, or "the cure," for

transsexualism, was discussed as well:

> The cure for the male transsexual consists not of psychiatric
> treatment designed to make the patient content with his
> biological sexual identity - that doesn't work - but of estrogen
> therapy designed to create the secondary sexual characteristics
> of a woman followed by the surgical removal of the genitals and
> the construction of a vagina-substitute out of penile tissue.
>
> . . .
>
> Someone eager to undergo this mutilation is plainly suffering
> from a profound psychiatric disorder.

*Id.* However, prisons do not necessarily have a duty to authorize these hormonal and

surgical curative procedures:

> Withholding from a prisoner an esoteric medical treatment that
> only the wealthy can afford does not strike us as a form of cruel
> and unusual punishment. It is not unusual; and we cannot see
> what is cruel about refusing a benefit to a person who could not
> have obtained the benefit if he had refrained from committing
> crimes. We do not want transsexuals committing crimes
> because it is the only route to obtaining a cure.
>
> It is not the cost per se that drives this conclusion. For
> life-threatening or crippling conditions, Medicaid and other
> public-aid, insurance, and charity programs authorize
> treatments that often exceed $100,000. Gender dysphoria is
> not, at least not yet, generally considered a severe enough
> condition to warrant expensive treatment at the expense of
> others than the person suffering from it. That being so, making
> the treatment a constitutional duty of prisons would give
> prisoners a degree of medical care that they could not obtain if
> they obeyed the law.

*Id.* at 672. Lastly, the Seventh Circuit stated: "We conclude that, except in special circumstances that we do not at present foresee, the Eighth Amendment does not entitle a prison inmate to curative treatment for his gender dysphoria." *Id.* at 672.

In *Phillips v. Michigan Department of Corrections*, 731 F. Supp. 792, 801 (W.D. Mich. 1990), the court granted a prisoner's motion for preliminary injunction ordering correctional officials to provide the inmate with estrogen therapy. The prisoner in that case was a thirty-four-year-old male-to-female transsexual who lived as a woman since she was seventeen. *Id.* at 793-94. Prior to incarceration, she had a number of "surgeries and other procedures to enhance her appearance as a female, including electrolysis, a brow lift, dermabrasions, a chemical face peel, jaw reduction, a chin implant, and breast implant surgery." *Id.* at 794. In addition, the inmate took estrogen treatment starting at the age of seventeen or eighteen to slow hair growth, soften skin, develop the breast implants, and further develop female characteristics. *Id.* Not long after her incarceration, the plaintiff was examined by a Michigan Department of Corrections physician who stopped the hormonal treatments and denied her requests for brassieres. *Id.* The prisoner's request for brassieres was later granted, after the physician's supervisor intervened. *Id.* In granting the request for a preliminary injunction, the court found that the prisoner had a serious medical need and that the defendant denied her medical care through both intentional conduct and deliberate indifference:

> The denial of medical care in this case stems from at least three sources - which in concert violate plaintiff's right under the constitution to be free from cruel and unusual punishment. A result decried in *Meriwether* and in dicta by the *Supre* and *Lamb* courts is present here: defendant has failed to provide plaintiff with treatment of any kind. And, as was the plaintiff in

> *Meriwether,* plaintiff has been the subject of ridicule and offensive remarks at the hands of Dr. Opika. Third, this Court characterizes defendant's conduct in this case as conduct which actually reversed the therapeutic effects of previous treatment. It is one thing to fail to provide an inmate with care that would improve his or her medical state, such as refusing to provide sex reassignment surgery or to operate on a long-endured cyst. Taking measures which actually reverse the effects of years of healing medical treatment, as I observe here, is measurably worse, making the cruel and unusual determination much easier.

*Id.* at 800 (footnote omitted).

In *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 158 (D. Mass. 2002), plaintiff Kosilek was a male-to-female transsexual sentenced to life in prison. Since his incarceration in 1990, Kosilek had tried to access proper diagnosis and treatment, but his claims were consistently denied by the institution. *Id.* at 159. While incarcerated, he tried to commit suicide on two occasions and to castrate himself. *Id.* at 158. Kosilek also complained of being in severe mental anguish. *Id.* He sued the Massachusetts Department of Corrections and Commissioner Michael Maloney, who in 2000 had adopted a blanket policy regarding the treatment of transsexuals in prisons. *Id.* Under the policy, transsexuals who had received treatment by doctors prior to incarceration could have that treatment continued after incarceration; however, transsexuals taking hormones that had not been prescribed by a doctor were not permitted to continue hormone usage in prison. *Id.* at 159-60. The policy also denied the possibility of any inmate receiving gender reassignment surgery. *Id.* at 160. Because Kosilek's transsexualism was undiagnosed, the policy denied him access to doctors for treatment and diagnosis of GID. *Id.*

46

The court found that Kosilek's GID was a serious medical need. *Id.* at 184. Kosilek's GID "has prompted him to attempt suicide twice while incarcerated, and to try to castrate himself as well. There is a significant risk that he will attempt to kill, mutilate, or otherwise harm himself again if he is not afforded adequate treatment for this disorder." *Id.* Next, the court found that Kosilek had not been offered adequate treatment for the serious medical need in that "[t]he services now being offered Kosilek are not sufficient to diminish his intense emotional distress, and the related risks of suicide and self-mutilation, to the point at which he would no longer be at a substantial risk of serious harm." *Id.* at 185. The court reasoned that "no informed medical judgment has been made by the DOC concerning what treatment is necessary to treat adequately Kosilek's severe gender identity disorder." *Id.* at 186. The Massachusetts Department of Corrections policy, also known as the Guidelines, prevented an individualized medical assessment:

> However, the Guidelines preclude the possibility that Kosilek will ever be offered hormones or sex reassignment surgery, which are the treatments commensurate with modern medical science that prudent professionals in the United States prescribe as medically necessary for some, but not all, individuals suffering from gender identity disorders. The Guidelines, in effect, prohibit forms of treatment that may be necessary to provide Kosilek any real treatment. Maloney's decision to implement the Guidelines precluded the medical professionals and social workers he employs and regularly relies upon from even considering whether hormones should be prescribed to treat Kosilek's severe gender identity disorder.

*Id.* at 186 (internal citation omitted). Thus, the court concluded that Kosilek satisfied the objective component of the Eighth Amendment. *Id.* at 189.

However, the court found that Maloney's failure to provide Kosilek with adequate care had not been due to deliberate indifference. *Id.* at 189-92. It pointed out

47

that his actions were like those of "a defendant with a legal problem" and were not taken to inflict pain on Kosilek. *Id.* at 162, 191. Finally, the court found that Maloney was not likely to be indifferent to Kosilek's serious medical need in the future. *Id.* at 193-95. It reasoned that Maloney "is now on notice that Kosilek's severe gender identity disorder constitutes a serious medical need" and, therefore, "the DOC has a duty to provide Kosilek adequate treatment." *Id.* at 193.

> It is permissible for the DOC to maintain a presumptive freeze-frame policy. However, decisions as to whether psychotherapy, hormones, and/or sex reassignment surgery are necessary to treat Kosilek adequately must be based on an "individualized medical evaluation" of Kosilek rather than as "a result of a blanket rule." Those decisions must be made by qualified professionals. Such professionals must exercise sound medical judgment, based upon prudent professional standards, particularly the Standards of Care.

> Thus, the court expects that Maloney will follow the DOC's usual policy and practice of allowing medical professionals to assess what is necessary to treat Kosilek. As the DOC does not employ anyone with expertise in treating gender identity disorders, the DOC may decide to follow its regular practice of retaining an outside expert to evaluate Kosilek and to participate in treating, or recommending treatment for him.

> The evidence demonstrates that, at a minimum, Kosilek should receive genuine psychotherapy from, or under the direction of, someone qualified by training and experience to address a severe gender identity disorder. It will be Kosilek's obligation to cooperate in establishing a proper relationship with his therapist(s). The Standards of Care indicate that such therapy, or such therapy and pharmacology, may be sufficient to reduce the anguish caused by Kosilek's gender identity disorder so that it no longer constitutes a serious medical need.

> If psychotherapy, and possibly psychopharmacology, do not eliminate the significant risk of serious harm that now exists, consideration should be given to whether hormones should be prescribed to treat Kosilek. Administering female hormones to a male prisoner in a male prison could raise genuine security

48

concerns. Maloney would be entitled to consider whether those concerns make it necessary to deny Kosilek care that the medical professionals regard as required to provide minimally adequate treatment for his serious medical need.

. . . .

As the Standards of Care explain, "hormone therapy alone may provide sufficient symptomatic relief to obviate the need for cross-living or surgery." If psychotherapy, hormones, and possibly psychopharmacology are not sufficient to reduce the anguish caused by Kosilek's gender identity disorder to the point that there is no longer a substantial risk of serious harm to him, sex reassignment surgery might be deemed medically necessary. *Id.* at 18. If that occurs, Maloney may consider whether security requirements make it truly necessary to deny Kosilek adequate care for his serious medical need. If and when he makes such a decision, a court may have to determine again whether the Eighth Amendment has been violated.

*Id.* at 193-95 (citations omitted).

In *De'Lonta v. Angelone,* 330 F.3d 630 (4th Cir. 2003), the court of appeals reversed the district court's dismissal of the complaint for failure to state a claim. The prisoner in that case, a biological male, had GID and was incarcerated in the custody of the Virginia Department of Corrections since 1983. *Id.* at 632. Department of Corrections doctors diagnosed the prisoner with GID and the prisoner received estrogen therapy from 1993 until 1995, at which time the treatment was terminated pursuant to a new Department of Corrections policy. *Id.* The policy provided that neither medical nor surgical interventions related to gender or sex change would be provided to inmates with GID. *Id.* Inmates entering prison taking hormone medication or already receiving such medication were to be informed of the policy and then the medication would be tapered immediately and afterward discontinued. *Id.* Following termination of his hormone medication, the prisoner developed

49

an uncontrollable urge to mutilate his genitals. *Id.* Repeatedly he requested resumption of the hormone therapy and treatment by a gender specialist, however, his requests were denied and the self-mutilation continued. *Id.* The court held first that the prisoner's "need for protection against continuous self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent." *Id.* at 634 (citing *Lee v. Downs,* 641 F.2d 1117, 1121 (4th Cir. 1981)). Next, it found that the inmate had stated an Eighth Amendment claim by alleging inadequate medical treatment to protect him from his compulsion to mutilate himself. *Id.* at 635.

In *Brooks v. Berg,* 270 F. Supp. 2d 302 (N.D.N.Y.), *vacated in part on other grounds*, 289 F. Supp. 2d 286 (N.D.N.Y. 2003), a prisoner, who was a biological male, diagnosed himself with GID. *Id.* at 304. The prisoner sought treatment by writing letters to a Mental Health Satellite Unit and to a supervisor; however, he never received a response. *Id.* The prisoner then filed his lawsuit alleging that the defendants failed to provide him with necessary medical treatment for his serious medical need in violation of the Eighth Amendment and asking the court to force the defendants to allow him to see a doctor qualified to propose a course of treatment. *Id.* at 305-06. Pursuant to a Department of Corrections policy, inmates who could prove that they received hormone therapy prior to incarceration might be eligible for continued hormone therapy. *Id.* at 305. The policy further stated that transsexual surgical operations were not honored during incarceration. *Id.*

The court found that the defendants were deliberately indifferent to the prisoner's serious medical need:

> Defendants do not contest Plaintiff's claim that he was never
> treated for GID notwithstanding numerous requests for

50

treatment. In addition, Defendants have not provided the Court with any evidence showing that the decision to refuse Plaintiff treatment was based on sound medical judgment. Finally, Defendants have failed to submit any evidence that they were not aware that Plaintiff's health could be jeopardized if treatment was refused. Accordingly, the Court finds that Defendants have failed to establish, as a matter of law, that Plaintiff was provided adequate treatment for his serious medical needs.

*Id.* at 310. The court went on to say:

This blanket denial of medical treatment is contrary to a decided body of case law. Prisons must provide inmates with serious medical needs some treatment based on sound medical judgment. There is no exception to this rule for serious medical needs that are first diagnosed in prison. Prison officials are thus obliged to determine whether Plaintiff has a serious medical need and, if so, to provide him with at least some treatment. Prison officials cannot deny transsexual inmates all medical treatment simply by referring to a prison policy which makes a seemingly arbitrary distinction between inmates who were and were not diagnosed with GID prior to incarceration. In light of the numerous cases which hold that prison officials may not deny transsexual inmates all medical attention, especially when this denial is not based on sound medical judgment, the Court finds that Defendants have failed to establish as a matter of law that their actions were objectively reasonable.

*Id.* at 312.

In *Praylor v. Texas Department of Criminal Justice,* 430 F.3d 1208, 1208-09 (5th Cir. 2005), a transsexual state prison inmate sought an injunction instructing the Texas Department of Criminal Justice ["TDCJ"] to provide him with hormone therapy and brassieres. The court simply concluded that the prisoner was not entitled to such treatment.

This circuit has not addressed the issue of providing hormone treatment to transsexual inmates. Other circuits that have considered the issue have concluded that declining to provide a transsexual with hormone treatment does not amount to acting with deliberate indifference to a serious medical need. *See, e.g., White v. Farrier,* 849 F.2d 322 (8th Cir. 1988)

51

(acknowledging that transsexualism is a serious medical condition, but holding that declining to provide hormone therapy did not constitute deliberate indifference to that medical need); *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987) (holding transsexual prisoner has no constitutional right to "any particular type of treatment, such as estrogen therapy"); *Supre v. Ricketts,* 792 F.2d 958, 963 (10th Cir. 1986) (concluding that declining to provide hormone therapy did not constitute deliberate indifference when prison officials offered alternate treatment). Assuming, without deciding, that transsexualism does present a serious medical need, we hold that, on this record, the refusal to provide hormone therapy did not constitute the requisite deliberate indifference.

In Praylor's case, the record reflects that he did not request any form of treatment other than hormone therapy. Testimony from the medical director at the TDCJ revealed that the TDCJ had a policy for treating transsexuals, but that Praylor did not qualify for hormone therapy because of the length of his term and the prison's inability to perform a sex change operation, the lack of medical necessity for the hormone, and the disruption to the all-male prison. *Cf. De'Lonta v. Angelone,* 330 F.3d 630, 635 (4th Cir. 2003). Moreover, the director testified that Praylor had been evaluated on two occasions and denied eligibility for hormone treatment and that the TDCJ did provide mental health screening as part of its process for evaluating transsexuals. *See Supre,* 792 F.2d at 963. Accordingly, based upon the instant record and circumstances of Praylor's complaint, the denial of his specific request for hormone therapy does not constitute deliberate indifference. *See Meriwether,* 821 F.2d at 413; *Supre*, 792 F.2d at 963.

*Id.* at 1209.

B. Discussion

It is undisputed that in December 1999, the DOC diagnosed Konitzer with GID and prescribed hormone therapy. It is also undisputed that since December 1999, Konitzer has cut open scrotal tissue (following transfer to GBCI); cut skin from his scrotum and tied cord around his testes (January 2001); attempted castration (May 2001); attempted castration (August 2001); succeeded in partial castration (October 2001); attempted

52

castration (August 2002); and attempted to castrate his remaining teste (May 2006). In addition, Konitzer attempted suicide in January 2001 and July 2003. With due regard for these undisputed facts, the defendants' statement admitting that Konitzer has a serious medical need for the purpose of summary judgment and the relevant case law lead the court to the conclusion that Konitzer's GID constitutes a serious medical need. *See Meriwether,* 821 F.2d at 411-13; *Maggert,* 131 F.3d at 671.

While it is undisputed that Konitzer's GID is a serious medical need, the defendants contend that they have not been deliberately indifferent to Konitzer's medical need. The parties disagree whether the defendants' failure to follow the Standards of Care in treating Konitzer's GID constitutes a substantial departure from accepted professional judgment. Moreover, they disagree whether the defendants' justifications for not providing the real-life experience to Konitzer are supported by a legitimate penological interest.

Defendants contend that they have not been deliberately indifferent to Konitzer's medical need because he has been evaluated consistently and treated by medical professionals. Konitzer's medical records establish that he has been seen many times for medical issues since 1999. (DFOF ¶¶4 210-588.) Inasmuch as Konitzer has received medical attention consistently, the defendants submit that they cannot be found to have been deliberately indifferent. Instead, they submit their course of treatment is different from what Konitzer, or his medical experts, would have chosen. And, because disagreement with medical professionals about treatment needs does not state a cognizable Eighth Amendment claim under the deliberate indifference standard of *Estelle v. Gamble,* 429 U.S. 97 (1976), the defendants argue that Konitzer's Eighth Amendment claim must fail. *Ciarpaglini v. Saini,* 352 F.3d 328, 331 (7th Cir. 2003). Moreover, the

53

defendants contend, the real-life experience that Konitzer seeks is contrary to the WRC and the DOC's legitimate institutional interest of prison security. *See Helling v. McKinney,* 509 U.S. 25, 37 (1993) (stating that the "realities of prison administration" are relevant to the issue of deliberate indifference); *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (finding that under the Eighth Amendment prison officials must, among other things, take reasonable measures to guarantee the safety of the inmates).

Defendants claim the Standards of Care are not necessary for the treatment of GID and GID is largely a self-diagnosed condition. (DFOF ¶ 33.) A patient diagnosed with GID chooses how to live after acknowledging the GID. (DFOF ¶ 34.) For individuals with GID, the Standards of Care emphasize the person's choices and options rather than speak of a diagnosis that requires necessary "treatment." (DFOF ¶ 35.) The Standards of Care put emphasis on flexible choices for individuals with GID. (DFOF ¶ 36.) The Standards of Care state that they "are intended to provide flexible directions for the treatment of persons with gender identity disorders." (DFOF ¶ 37; Daley Dep., Sept. 10, 2004, Ex. 12, Bates No. 5478.) Moreover, the Standards of Care advise that "[m]any adults with gender identity disorder find comfortable, effective ways of living that do not involve all the components of the triadic treatment sequence." (DFOF ¶ 38.) The transgendered situation is about choices, not medical necessity. (DFOF ¶ 39.) Each transgendered individual decides which options to pursue and how far and how fast to go with regard to those life-changing options—based on age, physical characteristics, income, employment, personality, pain tolerance, and desired lifestyle, among other considerations. (DFOF ¶ 40.) The Standards of Care include a criterion of being crime free. (DFOF ¶ 41.) This is accepted as the community standard in gender clinics throughout the world. *Id.* However,

54

prison life presents an inherent and irresolvable contradiction to this standard. *Id.* Prison life is a context that renders existing standard treatment guidelines for GID unrealistic and impossible. (DFOF ¶ 41.) New treatment guidelines for GID within prisons, with awareness of and in consideration of the complexities created by that situation, are yet to be developed. *Id.*

On the other hand, Konitzer submits that the Standards of Care were designed to present professional consensus about psychiatric, medical, and surgical management of gender conditions and the parameters within which professionals could offer services to individuals. (PFOF ¶ 20.) The Standards of Care are now in their sixth edition, having been revised in 2001. *Id.* The Standards of Care establish a triadic therapeutic sequence (the "Triadic Therapy"): (1) hormone therapy, (2) real-life experience, and (3) sex reassignment surgery. (PFOF ¶ 23.) Typically, the Triadic Therapy takes placed in the order of hormones => real-life experience => surgery. (PFOF ¶ 24.) A GID patient, however, may undergo a variety of different therapeutic options because clinicians recognize that not all persons with GID need or want all three elements of Triadic Therapy. (PFOF ¶ 25.) For a male-to-female GID patient like Konitzer, the first step of the Triadic Therapy, hormone therapy, entails the prescription of female hormones like estrogen. (PFOF ¶ 26.) The second step in the Triadic Therapy is the real-life experience, which is the act of fully adopting a new or evolving gender role or gender presentation in everyday life. (PFOF ¶ 27.) The real-life experience for male-to-female transsexuals includes the removal of unwanted hair, which further consolidates their female identity. (PFOF ¶ 28.) Hair is also removed with depilatories or lasers. (PFOF ¶ 29.) The final step of the Triadic

Therapy is sex reassignment surgery. (PFOF ¶ 30.) For individuals with profound GID, sex reassignment surgery, along with hormone therapy and real-life experience, is a treatment that has proven to be effective. *Id.* Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary. *Id.* Sex reassignment is not "experimental," "investigational," "elective," cosmetic," or optional in any meaningful sense. *Id.* It constitutes very effective and appropriate treatment for transsexualism or profound GID. *Id.* Psychotherapy is not a component of the Triadic Therapy. (PFOF ¶ 31.) The goal of psychotherapy, when it is employed, is to help the person live more comfortably within a gender identity and to deal effectively with non-gender issues. (PFOF ¶ 32.) Konitzer is not a good candidate for psychotherapy. (PFOF ¶ 33.)

Taking the facts in Konitzer's favor, the Standards of Care suggest necessary or recommended treatment for many GID patients. Further, although some persons may choose not to follow the Triadic Therapy, a reasonable jury could find that components of the Triadic Therapy, including the real-life experience, are appropriate for Konitzer. Among the evidence supporting this conclusion, is Dr. F. Ettner's opinion that refusing to provide Konitzer with the real-life experience puts him at risk for castration and self harm, and that the frustration of living with an untreated gender condition always has disastrous consequences. Dr. R. Ettner opined that Konitzer has not received the minimum standard of care for the treatment of GID and that many of Konitzer's interventions have been counter-therapeutic. Her view is that the overarching goal of Konitzer's treatment has been to assist him to adapting to life as a *male*. Cynthia Osborne stated that every group that operates in this country and abroad in the area of GID is familiar with the Standards of Care

56

and recognizes them as guidelines. (PFOF ¶ 131.) In defendant Dr. David Burnett's understanding of the Standards of Care, the real-life experience is a legitimate form of treatment for a GID patient, depending upon that person's individual situation. (PFOF ¶ 134.)

Mere differences of opinion among medical personnel regarding a plaintiff's appropriate treatment do not give rise to deliberate indifference. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). However, deliberate indifference may be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.*; *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) (citing as examples "the leg is broken, so it must be set; the person is not breathing, so CPR must be administered").

"[T]o prevail on an Eighth Amendment claim 'a prisoner is not required to show that he was literally ignored.'" *Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). A defendant 's contention that a medical care claim fails because the prisoner "received some treatment overlooks the possibility that the treatment [the prisoner] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotation marks omitted)).

This is not a case, as in *Meriwether*, *Phillips*, and *Brooks*, where a prisoner has been denied all medical care for GID. This case is more analogous to *Kosilek*, where

57

the treatment offered for GID is arguably inadequate because the patient keeps exhibiting the behavior seen in GID sufferers, repeated self-castration attempts.  The next level of treatment for Konitzer, according to the Standards of Care, is the real-life experience. However, most aspects of the real-life experience are unavailable to Konitzer because they are contrary to DOC policy as stated in Executive Directive #68.

Taking all reasonable inferences in a light most favorable to Konitzer, as the court must do at this stage, a reasonable jury could find that the defendants were deliberately indifferent to Konitzer's serious medical need when they failed to provide him with the second step of treatment from the Standards of Care, the real-life experience, in the face of his repeated self-mutilations and suicide attempts.  Clearly, what the defendants were doing to treat Konitzer was not working.

Next, the parties disagree whether denial of the real-life experience is justified by prison security concerns. The defendants assert that allowing Konitzer to have the real-life experience would compromise prison security.  According to the defendants, when an inmate enhances his differences in appearance or identity, such as appearing more feminine or homosexual in a male prison population, it significantly increases the likelihood that the inmate will be the target of aggression or the center of conflict among the prison population.  (DFOF ¶ 81.)  The inmate's use of female clothing and undergarments, the use of a female name, the use of hair removal products, and feminine makeup products gives a loud message to all observers.  It says to all inmates that the person is of the female gender and is available for sexual conduct; it is seen by all inmates as an open invitation

58

to compete for that person's attention and invites assaults.[10]   The consequences of providing Konitzer with property items typically associated with females while housed in a male correctional environment, could compromise Konitzer's safety and security, especially considering Konitzer's lengthy sentence structure.  (DFOF ¶ 84.)

Further, say defendants, the feminization of an inmate increases the work demand of existing staff resources by creating additional property management challenges, such as making sure that an inmate is not doing a brisk business in the sales or bartering of cosmetics or undergarments; resolving disputes over who is eligible to possess such items and who is not eligible; determining whether hair removal products or hair growth stimulators are an appropriate product for the general inmate population; finding an opportunity for peaceful integration of an inmate to a new living condition as he is being moved from another location; or continuously observing an inmate based upon a perception of increased risk.  Staff resources that would be required due to the increases of work demand created by the feminization of an inmate are exceptional, and staff will be drawn from attending to other operational duties in the institution that are also likely to involve safety and control. (DFOF ¶ 97.)  When an inmate enhances his differences in appearance or identity, such as appearing more feminine or homosexual in a male prison population, it significantly increases the likelihood that the inmate will be the target of aggression or the center of conflict among the prison population. (DFOF ¶ 98.)

---

[10] The defendants' argument that institution security would be compromised by allowing Konitzer to enhance his femininity is undermined inasmuch as the DOC has prescribed Konitzer feminizing hormone therapy since December 1999.

59

However, although a jury may well find that the defendants are justified in having a blanket policy that does not allow Konitzer to experience life as a female (through the use of modest makeup, womens' undergarments, female strip searches, facial hair remover, and being referred to as a female) in a male institution, on this record the court cannot grant summary judgment. Taking the facts in Konitzer's favor, modest makeup, female undergarments, facial hair remover or growth items, and being referred to as a female are part of the real-life experience.

With regard to a bra and makeup, it is undisputed that Konitzer's hormone therapy resulted in breast development. In September 2006, Dr. Kulstad of the UW Hospital noted that Konitzer's breasts were "consistent with [an] adult female" and that while hormone therapy provided some relief for GID, Konitzer remained distressed because he was not allowed to wear makeup or a bra.

Instead of a bra, the WRC provided Konitzer with a male-appropriate undergarment. Unlike a bra, a support undergarment for men who suffer from gynecomastia is a vest that acts to bind. (PFOF ¶ 180.) It is a garment that a female-to-male transsexual may use to *disguise* breast development. *Id.* A supportive undergarment designed for gynecomastia does not support the breasts, but damages them. *Id.* It is extremely tight and does not provide any support for Konitzer's breasts. (PFOF ¶ 181.) Instead it crushes them against Konitzer's chest wall and is very painful. *Id.*

Further, according to Dr. R. Ettner, the gynecomastia vest fails to substitute for a bra inasmuch as it does not provide Konitzer with an ego-syntonic state of mind. (PFOF ¶ 179.) The importance of the female attire is to provide Konitzer with an ego-syntonic state of mind. *Id.* ) In Dr. Claiborn's opinion, the use of female undergarments

60

is a choice on the part of Konitzer. However, Dr. Kulstad stated that a bra was medically necessary. Dr. Wellens felt that things like makeup and female underwear were necessary to alleviate Konitzer's psychological distress. (PFOF ¶ 175.) So, he would serve as a go-between for Konitzer and Warden Bertrand. *Id.*

Thus, rather than providing Konitzer with a supportive undergarment, the WRC has provided him with an undergarment that may cause him physical pain and fails to address his GID.

Makeup and items such as depilatories and hair growth stimulators are similar to feminine clothing for purposes of Konitzer's GID treatment. According to Dr. R. Ettner, the hair-related items may appear superficial or not medical but in fact play a prominent role in the treatment of GID and allow the patient to move from a discordant and uncomfortable life that interferes with their functioning into a safer and more comfortable gendered ecology. Again, Dr. Wellens believed things like makeup and female underwear were necessary to alleviate Konitzer's psychological distress and Dr. Kulstad noted that Konitzer was distressed because he was not allowed to wear makeup.

Similarly, sufficient evidence exists in the record that use of a female name may be required for Konitzer's treatment. For instance, Dr. Wellens observed after Konitzer was placed on hormone therapy that while the hormone therapy provided some relief, Konitzer remained distressed because he could not be referred to by his preferred female name. Konitzer has stated that staff refusal to treat Konitzer as a female causes him a great deal of pain, defeats his self-image and serves as a constant reminder of feeling that he is trapped in the wrong body. (PFOF ¶ 197.)

61

Defendants argue security concerns. As to a bra, defendants say the largest security concern with allowing Konitzer to wear female undergarments is furthering him being identified as a female in the prison population. (DFOF ¶ 169.) However, Konitzer has breasts—bra or no bra. Notably, upon meeting Konitzer for the first time, WRC inmate Wayne Polakowski thought he was a woman. (PFOF ¶ 167.) Thus, a reasonable jury could find that Konitzer looks female enough such that the addition of a bra will make little difference in singling him out among the male prison population.

Barstow and Canziani opine that if one male inmate has a bra, others will want them and security issues will arise. But other than this conclusory opinion, no evidence suggests that other inmates desire bras or that other inmates are denied recommended treatment items because others may desire them, too. Further, although some inmates have commented to Konitzer about his living situation, such as his shuttering the window of his cell when using the toilet, none has been negative, nor has Konitzer been assaulted since May 17, 2006, even though he has possessed women's undergarments in violation of WRC rules.

Theodore Witheril has visited Konitzer several times and has observed Konitzer wearing bras because the bra straps were visible as an outline underneath his shirts and because Konitzer told Witheril that he was wearing bras. (PFOF ¶ 169.) WRC inmate Wayne Polakowski has been incarcerated with Konitzer since June 2004, and has observed Konitzer wearing his clothes in a feminine manner, but is not aware of any problems between other inmates and Konitzer because of his appearance. (PFOF ¶ 168.) Dr. Wellens observed at GBCI that Konitzer was respected by inmates and was not aware of a single instance of hostility towards him by another inmate. (DFOF ¶ 185.)

62

Konitzer is not allowed to possess or use makeup because he could use it to disguise his appearance and identity and escape from the institution. (DFOF ¶ 177.) An inmate at Waupun Correctional Institution almost escaped from that institution after a visitor of the inmate came in and provided makeup to the inmate, who used it to nearly make it past the guard station because he looked like a female visitor. (DFOF ¶ 178.) For correctional staff members who are trained to look for males leaving the institution, say defendants, it is much more difficult if they have to be concerned about males made up to look like females. (DFOF ¶ 179.) And, argue defendants, given Konitzer's sentence structure and escape history, he is classified as a high risk for escape attempt. (DFOF ¶ 180.)

But a reasonable jury could find that this is a poor reason for denying Konitzer modest makeup. Again, Konitzer looks like a woman with or without the makeup; makeup may not change his appearance much at all. And WRC staff are supposed to check the identification of persons leaving the WRC. (PFOF ¶ 192.) Further, Konitzer's risk assessment indicates a low rating for escape history. (PFOF ¶ 191.)

Additionally, say defendants, possessing makeup could put Konitzer in a position of being in control of something that other inmates may want. (DFOF ¶ 182.) Contraband moves, and Konitzer can be offered money for things that other inmates want. (DFOF ¶ 183.) Further, if the makeup is in the hands of other inmates it could be used to feign an injury, such as a black eye to lure a staff member or other inmate to an inmates's room. But while Dr. Wellens was Chief Psychologist at GBCI, he observed Konitzer wearing makeup regularly without any apparent problems. Polakowski has observed Konitzer wearing makeup and is not aware of any problems between other inmates and Konitzer.

63

Defendants have pointed to no instances of Konitzer selling makeup items. And women prisoners at Taycheedah Correctional Institution are permitted to wear makeup, which would present similar concerns over feigning injury yet it appears that makeup is acceptable to the DOC when it is used by women prisoners.

Defendants have not provided sufficient security reasons regarding depilatories or Rogaine such that summary judgment could be granted. Majic Shave is sold in Waupun Correctional Institution and Oshkosh Correctional Institution. (PFOF ¶ 211.) Female inmates housed at Taycheedah Correctional Institution appear to be permitted Rogaine or other type of hair growth stimulators for medical purposes. (DFOF ¶¶ 205, 207.) Although there have been no instances where hair-related products have been approved for use by any DOC inmate or prescribed for use by any DOC medical professional for the treatment of hair loss (DFOF ¶ 208), Konitzer's treatment would be for GID, not a less serious hair loss issue.

In addition, summary judgment must be denied as to Konitzer's use of a female name or identification by female pronouns. Defendants argue that DOC inmates are prohibited from using false names and titles; they are not allowed to call themselves doctor if they are not a doctor, nor are they allowed to call themselves by nicknames, by their rank in a gang, or by religious titles. Calling inmates by names other than their legal names creates order and maintenance issues at a prison, presenting identity problems, escape issues, and power and control issues with inmates. (DFOF ¶ 147.) Staff need to know who an inmate is at the immediate time wherever they are, and they need to be accountable for their first and last name and inmate number. That is how the WRC identifies people, how

64

staff members maintain order, and how staff members ensure that inmates do not have power over other inmates.

Further, say defendants, allowing Konitzer to use a name other than the name under which he was incarcerated, would be treating him differently than other inmates who may want to use a name other than their legal name. The Wisconsin Administrative Code § DOC 303.31 makes it a disciplinary offense for any inmate to use a name other than the name by which the inmate was committed to the department unless the name was legally changed. (DFOF ¶ 151.) This is uniformly enforced for legitimate penological purposes. Allowing inmates to use nicknames or other titles would allow inmates to have a power relationship relative to other inmates. (DFOF ¶ 152.) In the past, inmates have used these terms, such as religious or gang titles, to exert their will, control, influence, and power over other inmates. Allowing inmates to identify themselves by something other than their legal names would enable them to misrepresent themselves to the public and could lead to predatory behavior and victimization.

Further, according to defendants, the database system used by the DOC's Division of Adult Institutions does not allow for more than one name to be used for the DOC number assigned to an offender. (DFOF ¶ 155.) This system carries essential information concerning each inmate offender, including background information, convictions, institutional transfer histories, program review actions, etc. DOC staff need to be able to quickly and uniformly identify any given inmate at any given time to access essential information about the inmate. (DFOF ¶ 156.) Allowing an inmate to use a name other than his or her legal name could also cause tracking problems for victim notifications. (DFOF ¶ 157.) Victims may be confused if a notification letter came that did not have the offender's

65

legal name listed. In addition, if a victim is not already in the system but later wishes to enroll for notification and only provides the inmate's old name, DOC may have difficulty finding the offender in the system.

Again, this is a jury issue. Referring to Konitzer by female pronouns does not appear to impinge on any of these security issues. Moreover, verbal reference about Konitzer or use of a female name in Konitzer's presence would not require any change to the DOC's database system or victim notification system. And the court is unpersuaded that staff at WRC will not know who Konitzer is when he uses his last name and prisoner identification number with "Donna Dawn" rather than "Scott." Further, Cynthia Osborne noted that the DOC should consider use of an inmate's chosen name and feminine pronouns by all treatment, security and administrative personnel, which can be done without pursuit of a legal name change.

However, in one respect summary judgment has been granted, and that is in regard to strip searches. Although the WRC will not tolerate deliberate mistreatment related to strip searches conducted on Konitzer, such as unnecessary lookers, the WRC's practices related to strip searches do not differ from the DOC, and it is reasonable that the practices be consistent. Order is very important in a prison environment. Therefore, Konitzer is strip searched and pat searched in accordance with DOC administrative rules.

It would become a management issue if the WRC were required to have only female officers strip search and pat search Konitzer. (DFOF ¶ 124.) Each correctional institution is operated with a specific number of established "posts." (DFOF ¶ 125.) These are locations where specific tasks are performed critical to the safe and controlled operation of the facility. It is essential that the posts in correctional institutions remain in operation.

66

(DFOF ¶ 126.) Staff is seldom pulled from posts except in the most extreme circumstances. Occasionally, where some scheduling overlaps or staff may be temporarily assigned from jobs that do not staff posts, they are available for reassignment. (DFOF ¶ 127.) It is best to leave the judgment to make reassignment up to the institution shift commander of the moment because he or she is closest to the conditions to exercise the best judgment.

It is not possible for the DOC to ensure that Konitzer will be pat searched or strip searched by female staff. (DFOF ¶ 137.) Also, staffing patterns and staff resources may not allow for this to occur. The availability of female correctional officers is controlled by the number of female officers employed at an institution, and staff who may be on leave. Labor contracts also affect the number of male and female correctional staff at institutions. There may be occasions when a female on any given shift is not available due to these factors. To create work positions merely for the purpose of ensuring that a female is available at all times to pat search or strip search Konitzer is impractical and cost prohibitive. (DFOF ¶ 138.)

The record indicates that Dr. R. Ettner cannot predict that being searched by a male guard would cause Konitzer harm, only that it would be extremely agitating for Konitzer. (DFOF ¶ 130.) And, in Dr. Claiborn's opinion, requiring that Konitzer be searched by female security officers only does not constitute a necessity and cannot be construed as "treatment" for Konitzer. (DFOF ¶ 131.) Additionally, Dr. Claiborn believes that examination by male personnel will not harm Konitzer.

Konitzer's situation is not unique or new to DOC. (DFOF ¶ 136.) There have been other inmates with breast development or gender issues that have been managed in adult male institutions. These inmates with similar situations have been managed safely

67

without special accommodations for searches.  Male officers perform the strip searches of these other inmates with breast development or gender issues.

On these facts, no reasonable jury could find that defendants have been deliberately indifferent to Konitzer's medical needs in regard to strip searches, and summary judgment has been granted as to this issue.  However, as to all other issues raised in defendants' summary judgment motion, summary judgment has been denied.

Dated at Milwaukee, Wisconsin, this 10th day of May, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE